## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— ) | |
| MILAN JANKOVIC, also known as )  | |
| PHILIP ZEPTER, FIELDPOINT B.V., and ) | |
| UNITED BUSINESS ACTIVITIES ) | |
| HOLDING, A.G., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:04 CV 01198 (RBW) |
| ) | |
| INTERNATIONAL CRISIS GROUP ) | |
| and Does 1 through 10, ) | |
| ) | |
| Defendants. ) | |
| ———————————————— ) | |

## MEMORANDUM OPINION

The plaintiffs bring this action alleging that the defendants committed defamation, false

light invasion of privacy, and tortious interference with business expectancy, by publishing

knowingly false statements in the form of three separate documents.  First Amended Complaint

("Compl.") ¶¶ 80-119.   International Crisis Group ("Crisis Group"), one of the defendants, has

filed a motion to dismiss or alternately to strike portions of the complaint pursuant to Federal

Rules of Civil Procedure 12(b)(6) and 12(f).  International Crisis Group's Motion to Dismiss at

1.  Currently before the Court are Crisis Group's Memorandum in Support of Motion to Dismiss

("Def.'s Mem."), Plaintiffs' Joint Memorandum of Points and Authorities in Opposition to

Defendant's Motion to Dismiss ("Pls.' Opp'n"), and Crisis Group's Reply Memorandum in

Support of Motion to Dismiss ("Def.'s Reply").  For the reasons set forth below, this Court

grants the defendant's motion to dismiss.

## I.  Factual Background

The plaintiffs in this action are Milan Jankovic, also known as Philip Zepter ("Philip Zepter"), Fieldpoint B.V. ("Fieldpoint"), and United Business Activities Holding, A.G. ("United Business").  Philip Zepter is a Serbian businessman who founded the Zepter Group in 1984. Compl. ¶ 1.  The Zepter Group is a collection of affiliated businesses which manufacture, distribute, and retail a wide range of consumer products throughout fifty countries.  Id. Fieldpoint and United Business are both affiliated companies of the Zepter Group, organized under the laws of the Netherlands and Switzerland, respectively.  Id. ¶¶ 1, 9-10.

The defendant, Crisis Group, is a non-profit organization organized under the laws of the District of Columbia.  Id. ¶ 11.  It is funded by donors, both public and private, and regularly produces analytical reports which make recommendations on the subject of international policy. Id. ¶¶ 26-27.

Crisis Group produced the three documents at issue in this litigation. The first was a report published on March 18, 2003, entitled "Serbia After Djindjic" (hereinafter "Report 141"). Id. ¶ 45; Id. Ex. A.  The second is an email sent by Crisis Group employee James Lyon on June 10, 2003, to then-Serbian Vice-President Zarko Korac ("Lyon Email").  Id. ¶ 67; Id. Ex. C.  The third was a report published on July 17, 2003, entitled "Serbian Reform Stalls Again" (hereinafter "Report 145").  Id. ¶ 53; Id. Ex. B.  These documents discuss the political climate of Serbia, and portions of them explicitly mention Philip Zepter and the Zepter Group.  The plaintiffs allege that portions of these documents state that the plaintiffs, among other things, engaged in criminal activity, smuggled weapons to the terrorist group Al Qaeda, and had ties to a Serbian intelligence agency and the former Serbian dictator Slobodan Milosevic.  Pls.' Opp'n at 18-19.

Believing that Crisis Group was organized under the laws of Belgium, the plaintiffs sued Crisis Group in the Court of First Instance, Brussels, Belgium, in January 2004. Compl. ¶ 71. The plaintiffs based this belief on public representations made by Crisis Group. Id. In fact, although Crisis Group maintains a Belgian organized entity for administrative purposes only, that entity is not the one responsible for the publication of the three documents. Id. ¶ 72. The plaintiffs claim they first learned of this in the defendant's initial reply to the Belgian complaint, filed on June 18, 2004. Id. ¶ 72-73.

Realizing Belgium to be an improper forum, the plaintiffs filed their original complaint in this Court on July 15, 2004. See Original Complaint. In this litigation, the plaintiffs allege that they are defamed by the contents of the three abovementioned documents, and bring causes of action under theories of libel, false light invasion of privacy, and tortious interference with business expectancy. Compl. ¶¶ 80-119. Included as defendants are ten yet to be identified parties (Does 1 through 10), whose identity the plaintiffs intend to ascertain through discovery. Id. ¶ 13.

Crisis Group moves to dismiss the claims against it for failure to state a claim upon which relief can be granted, or alternately to strike portions of the complaint for the same reason, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). International Crisis Group's Motion to Dismiss at 1. The defendant argues that the claims related to two of the three documents are barred by the statute of limitations, and that the statements in all three documents are not defamatory in nature as related to the plaintiffs.[1] Def.'s Mem. at 8, 13, 15.

---

[1] The defendant also advances an argument of collateral estoppel with respect to certain statements, and an argument that an element of the false light invasion of privacy claim is not present with respect to Lyon's email. Def.'s Mem. at 23, 44. Concluding that the complaint must be dismissed on other grounds, the Court will not address these arguments.

## II.   Standard of Review

On a motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), this Court must view all allegations and facts in the complaint in the light most favorable to the plaintiffs and must grant the plaintiffs the benefit of all inferences that can be derived from those facts.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr. v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16 F.3d at 1276.  Only the facts alleged in the complaint, documents attached as exhibits, and matters about which the Court may take judicial notice can be considered.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997).  The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

On a motion to strike portions of a complaint under Federal Rule of Civil Procedure 12(f), the Court must draw all reasonable inferences in the plaintiffs' favor.  Nwachukwu v. Karl, 216 F.R.D. 176, 178 (D.D.C. 2003).  Pursuant to Rule 12(f), the Court has discretion to strike "any redundant, immaterial, impertinent, or scandalous matter in order to avoid the time, effort, and expense necessary to litigate spurious issues." Id. (citations omitted).

## III.   Legal Analysis

The defendant argues that the plaintiffs' claims regarding two of the three documents at issue (the Lyon Email and Report 141) are barred by the applicable statute of limitations.  Def.'s Mem. at 8.  The Court begins its analysis with a discussion of whether the statute of limitations was tolled by the defendant's misconduct or the plaintiffs' inability to file a timely claim.  The

Court will then proceed to an analysis of whether the allegedly defamatory statements are capable of defamatory meaning. The Court will conclude with a brief discussion of the claims of false light invasion of privacy and tortious interference with business expectancy and their reliance on defamatory statements.

### (A)  Statute of Limitations

The plaintiffs' defamation claims are subject to the District of Columbia's one-year statute of limitations. D.C. Code Ann. § 12-301(4) (2001). The District of Columbia Court of Appeals has strictly enforced this jurisdiction's statutes of limitations, even where "in individual cases, the rationale for the limitations doctrine will not be served, and a dismissal would frustrate the well-established preference for adjudicating cases on their merits." Sayyad v. Fawzi, 674 A.2d 905, 905 (D.C. 1996). Claims of false light invasion of privacy and tortious interference with business expectancy, for which there are no express limitation periods in the District of Columbia, are subject to the same statute of limitations when such causes of action are "intertwined" with a cause specified by the District of Columbia Code.[2] Mittleman v. United States, 104 F.3d 410, 415 (D.C. Cir. 1997) (citing Saunders v. Nemati, 580 A.2d 660, 661-62 (D.C. 1990)) (additional citation omitted). Thus, these two causes of action are subject also to the one-year limitation period.

The parties do not dispute that both Report 141 and the Lyon Email were published more than one year prior to the filing of this action. Def.'s Mem. at 8; Pls.' Opp'n at 7. The defendant therefore argues that all claims arising from these documents are untimely. Def.'s Mem. at 8. The plaintiffs challenge the defendant's position on three separate grounds. First, the plaintiffs claim that the defendant, due to affirmative misconduct on its part, is estopped from claiming

---

[2]  Causes of action neither specified by the Code nor intertwined with specified causes are subject to the District of Columbia's three-year limitations period. D.C. Code Ann. § 12-301(8) (2001).

protection under the statute of limitations.  Pls.' Opp'n at 7.  Second, the plaintiffs claim that the defendant "lulled" them into not bringing this action in this jurisdiction until after the statute of limitations had expired.  Id. at 7-8.  Third, the plaintiffs claim that the statute was tolled by the inability of the plaintiffs to discover the proper identity of the defendant despite its due diligence to do so.  Id. at 12.  This Court will examine each of these arguments in turn.

The applicability of the doctrine of equitable estoppel is based on criteria "revolving around the conduct of the defendant . . . ."  Chung v. Dep't of Justice, 333 F.3d 273, 278 (D.C. Cir. 2003) (citation omitted).  The District of Columbia Court of Appeals has held that "affirmative acts employed by a party to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action" prevent the application of a statute of limitations.  Estate of Chappelle v. Saunders, 442 A.2d 157, 158 (D.C. 1982); accord Cevenini v. Archbishop of Washington, 707 A.2d 768, 773-74 (D.C. 1998) (citing Chappelle, 442 A.2d at 158).  However, the basis of the cause of action is construed narrowly, and the concealed facts must directly relate to the harm caused.  Chappelle, 442 A.2d at 159.  In Chappelle, the Court of Appeals held that "concealment of the identity of liable parties, unlike the concealment of the existence of a claim, is insufficient to toll the statute of limitations."  Id.  There, one defendant, an automobile driver, gave false contact information at the scene of an automobile accident in which he was involved.  Subsequent investigation by the plaintiff, based on license plate information acquired at the time of the accident, led to another defendant, the defendant driver's wife, who denied that her car was involved in the accident.  Id. at 157-58.  Because the misconduct involved concealment of the defendants' identities and not the elements of the negligence, the court concluded that the statute of limitations was not tolled.  Id. at 159.

Here, the misconduct alleged by the plaintiffs fails to satisfy the criteria for invoking equitable estoppel.  The plaintiffs offer a laundry list of alleged misrepresentations on the part of the defendant.[3]  Pls.' Opp'n at 7-12.  All of these alleged misrepresentations involve whether Crisis Group is one or two entities based in the District of Columbia or Brussels, Belgium, and none of them were specifically made to the plaintiffs.  The plaintiffs rely entirely on communications made to the public through the publications and website material.  Id.  None of these alleged misrepresentations directly relate to the elements of defamation; the only fact that the plaintiffs contend was concealed was the location where Crisis Group's alleged defamatory materials were published.  Id.  The plaintiffs do not assert that they were unaware of the existence of their claims, or the facts which form the underlying basis for the claims.  Thus, because the defendant's alleged misrepresentations could have led to nothing more than a mistaken belief about the situs of the making of the challenged publications, the statute of limitations was not tolled by the doctrine of equitable estoppel.

A similar doctrine which focuses on the conduct of the defendant, and may be employed to preclude the assertion of a statute of limitations bar, is the "lulling doctrine."  East v. Graphic Arts Indus. Joint Pension Trust, 718 A.2d 153, 156-57 (D.C. 1998).  Under this doctrine, a defendant cannot seek the shelter of the statute of limitations if the defendant has acted to lull the plaintiff into a state of inaction.  Id.  Where equitable estoppel requires fraud with respect to facts which form the underlying basis of a claim, the lulling doctrine can also be applied where a defendant wrongly convinces a plaintiff that claims will be redressed without the need for a

---

[3] Specifically, the plaintiffs argue the following: (1) that the cover pages to Reports 141 and 145 contain the Crisis Group logo with the words "Belgrade/Brussels"; (2) that the conclusions to Reports 141 and 145 are "signed" using the term "Belgrade/Brussels" and the date; (3) that Appendix A to Report 141 and Appendix B to Report 145 state that Crisis Group's "international headquarters [is] in Brussels" and that Crisis Group's American offices are advocacy offices; (4) that Crisis Group's website contains the equivalent of the information presented in the reports' appendices; (5) that the two Crisis Group organizations have suspicious similarities of purpose; (6) that certain individuals serve as Board members for both Crisis Group organizations; and (7) that statements by James Lyon confirm that Crisis Group's District of Columbia office is an advocacy office.  Pls.' Opp'n at 7-12.

lawsuit.  See Bailey v. Greenberg, 516 A.2d 934, 937 (D.C. 1986).  In this jurisdiction, the

lulling doctrine is construed narrowly.  Id.  And despite the lethargic connotation of the word

"lulling," affirmative action by a defendant that discourages the timely filing of a lawsuit is

required.  Id.

    Here, the lulling doctrine is unavailable to the plaintiffs because they allege no specific

act by the defendant directed to them.  None of the actions in which the defendant allegedly

engaged can be construed as having been taken for the purpose of lulling the plaintiffs into

inaction; indeed, the plaintiffs were not inactive, as they pursued relief in Belgium.[4]  The

plaintiffs were thus fully aware that litigation was the only way they could possibly obtain

compensation for the damages they allegedly sustained.  And, the plaintiffs incorrectly imply

that the defendant was obligated to inform them of their mistake in the Belgian action with

greater expediency  Pls.' Opp'n at 12.  Silence in the face of the plaintiffs' misperceptions does

not constitute an affirmative action.  Martinez v. Harford Casualty Ins. Co., ___ F. Supp. 2d ___,

___ 2006 WL 911895, at *5 (D.D.C. April 6, 2006) ("The defendant's failure to call the

plaintiff's attention to the [Insurance] Policy's expressly delineated limitations provision is

surely not such an affirmative inducement.").  Application of the lulling doctrine has been

limited to situations where potential defendants have thwarted the commencement of litigation

until the statutory filing period has elapsed.  East, 718 A.2d at 156-57.  This Court declines to

extend it to defendants who fail to inform the opposition that they have mistakenly chosen a

forum to pursue their litigation.

_____

[4] It is worth noting that the plaintiffs' Belgian action was limited to damages allegedly suffered in Belgium.  Compl.
¶ 71.  In the present action, the plaintiffs' allege damages suffered worldwide, including such specific locations as
Monaco and the United States.  Compl. ¶¶ 75-78.  While not affecting this Court's decision, this fact leads to the
inference that the plaintiffs intended to seek additional relief in jurisdictions other than Belgium.

While equitable estoppel and lulling both require action on the part of a defendant, the doctrine of equitable tolling focuses on the conduct of a plaintiff. Chung, 333 F.3d at 278. Equitable tolling allows plaintiffs "to avoid the bar of the limitations period if despite all due diligence [they are] unable to obtain vital information bearing on the existence of [their] claim." Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1367 (D.C. Cir. 1998) (citation omitted). However, the District of Columbia Court of Appeals has expressly rejected the case-by-case application of the equitable tolling doctrine

> where a trial judge would weigh the diligence of the defaulting party against any prejudice to the opponent of the suit . . . on the belief that where the legislature has provided no savings statute, courts would exceed their prescribed role by providing a remedy where the legislature has determined that none should lie.

Sayyad, 674 A.2d at 906 (citations omitted). Equitable tolling is therefore inapplicable despite "good-faith mistakes of forum." Id.[5] Here, the plaintiffs' alleged good-faith mistake of forum was rooted in confusion between Crisis Group's two entities. Pls.' Opp'n at 12-13. As the Sayyad court made clear, the District of Columbia does not permit use of the equitable tolling doctrine in such situations.

For these reasons, the plaintiffs' attempt to bar the statute of limitations defense must fail. All claims arising from Report 141 and the Lyon Email must therefore be dismissed as untimely.

---

[5] The District of Columbia recognizes a "discovery rule," which is similar to the equitable tolling doctrine but broader in application. It applies "in cases where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs...." Bussineau v. President and Directors of Georgetown College, 518 A.2d 423, 425 (D.C. 1986). Under this rule, the statute of limitations begins to run when a plaintiff through due diligence can be expected to know "(1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." Id. at 435. As is clear from the action filed in Belgium, the plaintiffs were aware (1) of their alleged injury and (2) its alleged cause being the publication of (3) allegedly defamatory information when that action was filed. The discovery rule is therefore inapplicable in this case.

### (B)  Defamation

Courts in the District of Columbia have held that a claim of defamation requires the

plaintiff to prove four elements:

> (1) that the defendant made a false and defamatory statement concerning the
> plaintiff; (2) that the defendant published the statement without privilege to a
> third party; (3) that the defendant's fault in publishing the statement amounted to
> at least negligence; and (4) either that the statement was actionable as a matter of
> law irrespective of special harm or that its publication caused the plaintiff special
> harm.

Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005) (citation and internal quotation marks omitted).

A defamatory statement is one that "tends to injure [the] plaintiff in his trade, profession or

community standing, or lower him in the estimation of the community."  Guilford Transp.

Indus., Inc. v. Wilner, 760 A.2d 580, 594 (D.C. 2000) (citation and internal quotation marks

omitted) (alteration in original).  However, a remark is not defamatory unless it is "more than

unpleasant or offensive; the language must make the plaintiff appear odious, infamous or

ridiculous."  Id. (citation and internal quotation marks omitted).  A publication of allegedly

defamatory statements must be considered "as a whole, in the sense in which it would be

understood by the readers to whom it was addressed."  Howard Univ. v. Best, 484 A.2d 958, 989

(D.C. 1984).  A defamation claim must be dismissed by a court unless it is reasonably capable of

defamatory meaning.  Klayman v. Segal, 783 A.2d 607, 612 (D.C. 2001).  Whether a statement

is reasonably capable of defamatory meaning is a question of law.  Weyrich v. New Republic,

235 F.3d 617, 627 (D.C. Cir. 2001).

The plaintiffs here allege that three excerpts in Report 145 contain defamatory

statements.  Compl. ¶¶ 53-61.  This Court will examine each of them in turn.

### (1)  Excerpt One

The first excerpt reads:

"The BIA [Serbian state security] as a whole is deeply compromised by criminal activities as well as numerous other illegal actions under Milosevic.  It appears to have shadowy connections to at least two banks—Komercijalna Banka and Kapital Banka—and maintains close ties with a third, Zepter Banka.  It has been involved in the weapons trade, through such front companies as Grmec.  Its most dangerous component is the so-called military line, composed of former officers who transferred from the army in the early 1990s.  Many of these are engaged in economic activities connected to some of the mentioned banks."

Compl. ¶ 55 (quoting Compl., Ex. B at 15).

The defendant challenges this excerpt, among other reasons, because it does not contain false and defamatory statements concerning the plaintiffs.  Def.'s Mem. at 13-15; see Oparaugo, 884 A.2d at 76 (elements of a defamation claim).  For a statement to be of and concerning a plaintiff, it must "lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."  Croixland Prop., Ltd. v. Corcoran, 174 F.3d 213, 216 (D.C. Cir. 1999).  This Court must therefore decide whether a reader of Report 145 would construe the mention of Zepter Banka as a reference to Philip Zepter, Fieldpoint, or United Business.

The plaintiffs rely heavily on Croixland as precedent for treating defamation of a business entity as the equivalent of defamation of its owner.  Pls.' Opp'n at 13-15.  There, lobbyists attempting to block a transaction stated that the owner of a race track was "connected to organized crime." Croixland, 174 F.3d at 215.  The lobbyists, however, misstated that the owner was a company called "Delaware North," when in reality it was Croixland.  Id. at 215-16.  The court found that Croixland properly asserted a defamation claim, as a reasonable listener could infer that the statements referred to Croixland.  Id. at 217-18.

Croixland can be distinguished from the situation here by the very nature of the statements that were purportedly defamatory.  The statements in Croixland referred not to the race track, but to the race track's owner.  Id. at 216 ("'the owners of the Hudson greyhound

facility are connected to organized crime'"").  Here, the excerpt referenced above does not

indicate a relationship between the BIA and the <u>owner</u> of Zepter Banka, but to Zepter Banka

itself.  <u>See</u> <u>Pullman Indus., Inc. v. Mfrs. Enameling Corp.</u>, 15 Fed.Appx. 297, 302 (6th Cir.

2001) ("Pullman Industries cannot rely upon [<u>Croixland</u>] for support because the Miller Products

letter does not refer to it 'by definition' or 'by description' in the statement couching the

misappropriation charge.").

 Furthermore, the accusations directed at the owner in <u>Croixland</u> were of connections to

organized crime, an entity whose very existence is criminal.  In contrast, the BIA is a Serbian

government agency.  Any suggestion of a connection to "organized crime" connotes

involvement with illegal activity, whereas a statement accusing a Serbian bank of ties to a

Serbian government agency requires something more to even arouse suspicion of corruptive

complicity and resultant defamatory implications.  Although the excerpt explicitly accuses the

BIA of internal corruption, its alleged "close ties" to Zepter Banka do not carry the same sinister

message as an accusation of connections to organized crime.  While BIA may exploit its alleged

ties to Zepter Banka to further its criminal activities, there is no explicit indication that Zepter

Banka is complicit in any such wrongdoing.  <u>See</u> <u>Rubin v. U.S. News & World Report, Inc.</u>, 271

F.3d 1305, 1308-09 (11th Cir. 2001) (holding that a gold refinisher mentioned in an article about

drug traffickers laundering money in the gold trade was not defamed, since the article did not

indicate that the gold refinisher knowingly took part in the laundering activity).

 Another case cited by the plaintiffs is <u>Caudle v. Thomason</u>, 942 F. Supp. 635 (D.D.C.

1996).  Pl. Opp'n at 14-15.  In this case, the president and chief executive officer ("CEO") of a

company sued in his personal capacity for libel based on statements made about the company.

<u>Caudle</u>, 942 F. Supp. at 638.  The court held that as president and CEO of the company, it was

possible that allegations of wrongdoing by the company could implicate him personally.  Id.

The key to the Caudle decision was that Caudle alleged in his complaint that "he 'made all

business decisions regarding corporate actions which are the subject matter of this lawsuit.'"  Id.

(quoting Caudle's complaint).  Under those circumstances, the court reasoned that a listener

might infer that Caudle was responsible for any wrongdoing committed by the company.  Id.

This Court cannot perceive the likelihood of a similar inference being made here.  Philip

Zepter is not the owner of a small company, but the founder of a "global enterprise . . . based in

more than fifty countries on five continents across the world."  Compl. ¶ 14.  The idea that

readers of Report 145 would hold him personally responsible for the corruption of a Serbian

government agency because a small arm of his business empire maintains "close ties" with this

agency is neither expressly alleged by the plaintiffs nor reasonable for this Court to presume.

The plaintiffs additionally contend that Fieldpoint and United Business are proper parties

to this litigation because Fieldpoint owns the Zepter trademarks, United Business distributes the

Zepter products under these trademarks, and "any injury to the Zepter name directly impacts

both Fieldpoint and United Business."  Pls.' Opp'n at 17.  However, the question at this stage of

the Court's analysis is not whether the plaintiffs suffered damages.  The question is whether the

statement indicated or reasonably suggests the plaintiffs' involvement in the wrongdoing.

For the excerpt to be a defamatory statement concerning the plaintiffs, a reader of Report

145 would have to make the following chain of inferences:  (1) that Crisis Group's accusations

of corruption within the BIA are accurate; (2) that the "close ties" the BIA allegedly shares with

Zepter Banka are related to this corruption, despite the fact that they are not considered the same

as the "shadowy connections" Zepter Banka allegedly shares with the other two mentioned

banks; (3) that Zepter Banka was not simply being used by the BIA, but was a willing partner

complicit to the BIA's purported corruption; (4) that Philip Zepter was personally involved and complicit in this corruption; and (5) that the corruption was so pervasive as to involve Zepter Banka's sister companies, Fieldpoint and United Business.  While there may be the metaphysical possibility of some remote implication of corruption on the part of Zepter Banka conveyed by this first excerpt, this Court finds that no reasonable reader would extend that implication of corruption to the plaintiffs.  This excerpt is therefore not capable of defamatory meaning with respect to the plaintiffs, and any claims of defamation arising from it must be dismissed.

**(2)     Excerpt Two**

The second excerpt reads:

> "The unwillingness to continue the crackdown reflects the power of the Milosevic-era financial structures that with the rigid oversight once provided by the dictator removed have transformed themselves into a new Serbian oligarchy that finances many of the leading political parties and has tremendous influence over government decisions.  Some of the companies were originally formed as fronts by the State Security or Army Counterintelligence (KOS), while others operated at the direct pleasure of the ruling couple.  Under Milosevic, many of these companies profited from special informal monopolies, as well as the use of privileged exchange rates.  In return, many of them financed the regime and its parallel structures."

> "Some of the individuals and companies are well known to average Serbs: . . . Zepter (Milan Jankovic, aka Philip Zepter)[6] … are but some of the most prominent.  Because of the support they gave to Milosevic and the parallel structures that characterized his regime, many of these individuals or companies have at one time or another been on EU visa ban lists, while others have had their assets frozen in Europe or the US."

> "In the popular mind, they and their companies were associated with the Milosevic regime and benefited from it directly.  The DOS campaign platform in September 2000 promised that crony companies and their owners would be forced to answer for past misdeeds.  Few of the Milosevic crony companies have been subjected to legal action, however.  The enforcement of the 'extra-profit' law is often viewed as selective and there have been only a handful of instances in

---

[6] The excerpt is reproduced here as it was in the complaint, with the omission of the full list of well-known companies.  In the original report, Zepter is identified fourth in a list of sixteen companies, most along with named individuals.  Compl., Ex. B at 17.  The excerpt, as reproduced here, also omits the footnoted citations from Report 145, discussed *infra*.  Id.

which back taxes, perhaps 65 million Euros worth, have been collected.  Most
disturbing is the public's perception that at a time when the economy is
worsening these companies' positions of power, influence, and access to public
resources seem to have changed very little."

Compl. ¶ 57 (quoting Compl., Ex. B at 17-18).  While this excerpt makes explicit mention of

Philip Zepter and the Zepter Group, the question remains whether the statements in this excerpt

are capable of defamatory meaning with respect to the plaintiffs.

The plaintiffs specifically take issue with the sentence that states that "many of these

individuals or companies have at one time or another been on EU visa ban lists, while others

have had their assets frozen in Europe or the US."  Compl. ¶¶ 57-58.  However, the plaintiffs

admit that Zepter Banka had its assets frozen in the United States, and what belongs to Zepter

Banka belongs to the Zepter Group.[7]  Pls.' Opp'n at 22.  While the plaintiffs argue that use of the

word "many" implies that Philip Zepter or the Zepter Group were on a visa ban list, this sentence

is clearly constructed in a manner to indicate that the companies fell into two categories—those

on the ban list and those who had their assets frozen.[8]  Given the plaintiffs' admission that Zepter

Banka had its assets frozen by the United States, no set of facts can show this sentence to be

false or imply false facts, and it therefore cannot be the basis for a defamation claim.

Other statements of this excerpt in various ways link "many" and "some" of the thirty-

one companies and individuals listed to the regime of Slobodan Milosevic, who, of course, was

subsequently deposed, extradited and put on trial as a war criminal before his death earlier this

---

[7] This statement is not at odds with the Court's finding, supra, that referencing Zepter Banka does not refer to the
entire Zepter Group.  While the day-to-day practices and deeds of Zepter Banka are not likely to be directly caused
by Philip Zepter, Fieldpoint, or United Business, the assets of Zepter Banka are the property of the Zepter Group.

[8] If this were not perfectly clear from the sentence itself, the sentence ends with a footnote that lists two Internet
links, http://europa.eu.int/index.eu.htm# and http://www.treas.gov/offices/eotffc/ofac/sdn/index.html. Compl. Ex. B
at 17 n.80.  The link to the European Union visa ban list is no longer active.  However, the link to the Department of
the Treasury has archived lists of the companies whose assets were frozen for the past twelve years, including Zepter
Banka.  These links make clear that this sentence was based on publicly available government information.  What
little confusion the sentence could possibly cause is easily dispelled by any reader willing to perform minimal
research.

year.  While many may characterize the Milosevic regime as infamous, mere association of a

Serbian company with a Serbian dictator is not defamatory on its face.  In fact, Crisis Group

makes no mention of war crimes or ethnic cleansing by Milosevic or the Serbian government.

What is conveyed in most of these statements are allegations of mutual support between

Milosevic and Serbian businesses, which makes the criticisms political, not criminal.

> [Defamation] necessarily, however, involves the idea of disgrace; and while a
> statement that a person is a Republican may very possibly arouse adverse feelings
> against him in the minds of many Democrats, and even diminish him in their
> esteem, it cannot be found in itself to be defamatory, since no reasonable person
> could consider that it reflects upon his character.

Guilford, 760 A.2d at 594 (emphasis in original).

The only place in this second excerpt where the report alludes to actual wrongdoing is in

the third paragraph.  However, no actual accusations are made against the named companies.

First, an allegation is made that the public perceived an association between the companies and

Milosevic.  For the reasons stated above, that statement alone is not defamatory.  Cf. Cohn v.

Nat'l Broad. Co., 414 N.Y.S.2d 906, 909 (N.Y. App. Div. 1979) (associates and aides of the late

Senator Joseph McCarthy were not defamed through association by a film which allegedly

disparaged McCarthy).  The paragraph goes on to state that a Serbian political party made a

campaign promise to force company owners to "answer for their past misdeeds."  However, the

fact that neither the companies nor the misdeeds are identified with any specificity, and the

statements are not attributed to Crisis Group but to a political party, the Democratic Opposition

of Serbia (DOS), renders the claim about "misdeeds" nothing more than political rhetoric.  Cf.

Weyrich, 235 F.3d at 620 (holding that a plaintiff was not defamed by a statement in an article in

The New Republic calling him "paranoid" because the word was used in a "popular, not clinical"

sense).  The sentences which follow simply allege that despite the DOS's promises, no legal

action has been taken.  Moreover, the claim that enforcement of a law is "selective" does not implicate the plaintiffs in any way, for, in fact, none of the plaintiffs are Serbian businesses operating under the "extra-profit" law.  <u>See</u> discussion at III(B)(1), <u>supra</u>.  The entire paragraph is constructed to highlight the public's perception about a political party's promises to curtail the companies' political power and its failure to fulfill that promise.  At worst, the paragraph implies that the Serbian companies of the Zepter Group, along with fifteen other companies, benefited from government support during Milosevic's reign, and, despite Milosevic's removal from power, still do.

In sum, this second excerpt is, at heart, critical of the power that businesses allegedly have had and continue to have in the present day Serbian government.  Indeed, Crisis Group seems not to criticize the companies for having such power, but rather criticizes the government for allowing the companies to have it.  To accuse a Serbian company of seeking political power does not rise to the "odious, infamous, or ridiculous" level necessary for claims of defamation, particularly when the plaintiffs are not Serbian companies.  <u>Guilford</u>, 760 A.2d at 594.  Because these statements are incapable of defamatory meaning with respect to the plaintiffs, all claims of defamation arising from this second excerpt must be dismissed.

       **(3)**      **Excerpt Three**

The plaintiffs allege that Report 145 "falsely states that Mr. Zepter 'holds a key position of influence' within the cabinet of the Serbian Prime Minister, based on the fact that an advisor of the former Serbian Prime Minister was also a former employee of the Zepter Group."  Compl. ¶ 59 (quoting Compl., Ex. B. at 18).  This Court can only assume that the plaintiffs are referring to the following excerpt from Report 145:  "Two other individuals with close ties to Milosevic era financiers hold key positions of influence within the Premier Zivkovic's cabinet.  The chief

of staff, Nemanja Kolesar, is a former employee of Delta, while Zoran Janjusevic, an advisor, is a former employee of both State Security and a Zepter company." Id., Ex. B at 18.

      This excerpt is in no way of and concerning the plaintiffs in this action.  The statement refers to a former Zepter employee, claiming that this former employee has close ties to Zepter and to the current regime in Serbia.  No reasonable reader could take this to mean that Philip Zepter "holds a key position of influence" in the prime minister's cabinet.  Rather, that key position of influence is clearly stated as held by Zoran Janjusevic, who once worked for a Zepter company.  There is nothing "odious, infamous, or ridiculous" stated in regards to Janjusevic's move from the private to public sector.  At worst, this third excerpt implies impropriety in a former Zepter employee holding a position of power in the Serbian government, a fact which the plaintiffs admit.  Id. ¶ 59.  Therefore, it is not capable of defamatory meaning, and all claims of defamation arising from this third excerpt must be dismissed.

**(C)  False Light Invasion of Privacy and Tortious Interference with Business Expectancy**

      The defendant argues that where defamation claims cannot be maintained, neither can claims of false light invasion of privacy and tortious interference with business expectancy when they are based on the same acts.  Def.'s Mem. at 43.  The plaintiffs' only counter-argument is the generally expressed position that their defamation claims can be maintained.  Pls.' Opp'n at 28. The law in this jurisdiction as to the tort of false light invasion of privacy is clear, and the key difference between this tort and defamation concern the injuries a damage award is designed to redress, not the underlying act itself.  White v. Fraternal Order of Police, 909 F.2d 512, 518 (D.C. Cir. 1990).  In regard to tortious interference with business expectancy, there appears to be no legal authority directly on point in this jurisdiction.  However, this Court sees no reason not to follow the lead of courts in other jurisdictions cited by the defendant, since to hold otherwise

"would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations [of] the law of defamation . . . ." Aequitron Med., Inc. v. CBS, Inc., 964 F. Supp. 704, 710 (S.D.N.Y. 1997); see also Brown & Williamson Tobacco Co. v. Jacobson, 713 F.2d 262, 273-74 (7th Cir. 1983).  Thus, because all of the plaintiffs' claims are rooted in the same alleged defamatory conduct, they must all be dismissed for the reasons their defamation claims cannot be maintained.

## IV.   Conclusion

For the foregoing reasons, all of the plaintiffs' claims must be dismissed.

**SO ORDERED** this 1st day of May, 2006.


REGGIE B. WALTON
United States District Judge