**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MILAN N. JANKOVIC, also known as PHILIP ZEPTER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:04 CV 01198 (RBW) ) |
| INTERNATIONAL CRISIS GROUP, | ) ) |
| Defendant. | ) ) ) |

**OPPOSITION OF DEFENDANT INTERNATIONAL CRISIS GROUP TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AFFIRMING HIS STATUS AS A PRIVATE FIGURE</u>**

Michael D. Sullivan, D.C. Bar No. 339101
Thomas Curley, D.C. Bar No. 473798
Levine Sullivan Koch & Schulz, LLP
1899 L Street, N.W., Suite 200
Washington, D.C.  20036
Telephone: (202) 508-1138
Facsimile: (202) 861-9888
Email: msullivan@lskslaw.com

Jonathan Greenblatt, D.C. Bar No. 449874
Shearman & Sterling LLP
801 Pennsylvania Ave., N.W., Suite 900
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile:  (202) 508-8100
Email: jonathan.greenblatt@shearman.com

Neil H. Koslowe, D.C. Bar No. 361792
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 508-8118
Facsimile:  (202) 508-8100
Email: nkoslowe@gmail.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.      ICG DOES NOT CONTEND THAT ZEPTER IS A "GENERAL
        PURPOSE" PUBLIC FIGURE ............................................................................... 1

II.     ZEPTER MISAPPREHENDS THE LIMITED PURPOSE
        PUBLIC FIGURE ANALYSIS ............................................................................... 4

        A.      Identifying the Pre-Existing Public Controversy ...................................... 4

        B.      The Record Establishes That Zepter Voluntarily Participated In The
                Public Controversy Concerning Serbian Political And Economic
                Reforms ................................................................................................... 12

                1.      The fact that plaintiff did not figure prominently in Report No.
                        145 does not mean he did not participate in the public
                        controversy .................................................................................... 12

                2.      Although Zepter contends that his relationship with Prime
                        Minister Djindjic was of a "private" nature, their alliance was
                        actually a matter of common knowledge and public concern ..................... 14

                3.      Zepter's voluntary association with Djindjic thrust him into
                        the public controversy .................................................................... 15

                4.      Even if Zepter intended his dealings with the Serbian Prime
                        Minister to remain private, it was foreseeable that the
                        relationship would attract attention and engender controversy ................ 19

                5.      Zepter is mistaken:  ICG did not create the public controversy ............... 22

        C.      The Challenged Statement is Germane to the Public Controversy ..................... 23

CONCLUSION ................................................................................................................. 24

i

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                    Page(s)

*Buchanan v. Associated Press*, 398 F. Supp. 1196 (D.D.C. 1975)..................................................2

*Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485 (D.S.C. 2000).............................................................16

*\*Clyburn v. News World Communications*, 903 F.2d 29 (D.C. Cir. 1990) ...................................20

*FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362 (D. Vt. 1984) .................................16

*Foretich v. ABC*, 1997 WL 669644 (D.D.C. Oct. 17, 1997) ...........................................................1

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ..........................................................................4

*\*Gray v. St. Martin's Press, Inc.*, 1999 WL 813909 (D.N.H. May 19, 1999)................................2

*Hoffman v. Washington Post Co.*, 433 F. Supp. 600 (D.D.C. 1977) ...............................................2

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ..............................................................................22

*\*Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011) ...........................1, 19, 22

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ...................................................................1

*Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947 (D.D.C. 1976) ...........6

*McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir.1985) .......................................................... 19-20

*Novecon, Ltd. v. Bulgarian-American Enterprise Fund*, 977 F. Supp. 45 (D.D.C. 1997) .............3

*\*OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005) ........... *passim*

*Patrick v. Cleveland Scene Publishing LLC*, 582 F. Supp. 2d 939 (N.D. Ohio 2008) .................16

*Rebozo v. Washington Post Co.*, 637 F.2d 375 (5th Cir. 1981)...............................................20, 21

*Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859 (5th Cir. 1978) .........................................20

*\*Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069 (3d Cir. 1988).....................13, 21, 22

*Stark v. Phi Beta Kappa Sorority, Inc.*, 587 F. Supp. 2d 170 (D.D.C. 2008) ..................................2

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc) .........................................1, 3, 5, 6

*Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774 (D.C. Cir. 1968) ........................ 1-2, 18

*\*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ...............4, 5, 12, 17

**OTHER AUTHORITIES**

RODNEY SMOLLA, LAW OF DEFAMATION (2d ed. 2006) ................................................................19

## INTRODUCTION

Pursuant to Local Civil Rule 7(h) and Rule 56 of the Federal Rules of Civil Procedure, defendant International Crisis Group ("ICG") respectfully submits this memorandum in opposition to the motion of plaintiff Milan N. Jankovic a/k/a/ Philip Zepter ("Zepter") for partial summary judgment affirming his status as a private figure. [1]

## ARGUMENT

## I.   ICG DOES NOT CONTEND THAT ZEPTER IS A "GENERAL PURPOSE" PUBLIC FIGURE

Although Zepter is often likened, by himself and others, to Bill Gates – unquestionably as famous a celebrity as there is in the business world – ICG does not ask the court to confer "general purpose" public figure status upon the plaintiff.   "[T]he 'general fame or notoriety' formulation is the standard for a general public figure; a plaintiff need not attain that level of notoriety to be a limited public figure."  *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 47 (D.D.C. 2005) (citations omitted); *accord, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 20-21 (1st Cir. 2011) ("debate [over the degree of fame required to be a general purpose public figure] has no relevance" in a dispute over "a *limited*-purpose public figure" who is defined "in terms of the controversy that he has stepped into") (citations omitted).

Many individuals who were largely unknown to the general public have nonetheless been found to be limited purpose public figures as a result of their participation in various public controversies.  *See, e.g.*, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1281 (D.C. Cir. 2003) (Navy combat pilot); *Foretich v. ABC*, 1997 WL 669644, at *3 (D.D.C. Oct. 17, 1997) (parent in custody dispute); *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc) (Mobil Corporation president); *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774, 776 (D.C. Cir.

---

[1] Zepter has filed two summary judgment briefs.  This opposition brief addresses the first, filed April 4, which seeks a determination that he is not a public figure, and is referred to herein as "Pl's 1st S.J. Br."  *See* Dkt. No. 145.  Zepter's second summary judgment brief, filed April 8, seeks partial judgment on the issue of falsity.  ICG has filed a separate opposition ("ICG's Opp. to 2d S.J. Br.") to that motion by Zepter, which is referred to herein as "Pl's 2d S.J. Br."  *See* Dkt. No. 147.

1968) (political supporter of municipal candidates); *Stark v. Phi Beta Kappa Sorority, Inc.*, 587 F. Supp. 2d 170, 177 (D.D.C. 2008) (sorority girl who contacted media, appeared in two interviews and provided quotes for press release); *Hoffman v. Wash. Post. Co.*, 433 F. Supp. 600, 604 (D.D.C. 1977) (barbell company president), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978); *Buchanan v. Associated Press*, 398 F. Supp. 1196, 1202-03 (D.D.C. 1975) (accountant assisting on presidential reelection committee).

Thus, the significance Zepter attaches to the fact that not all ICG personnel knew who he was prior to publication is misplaced.  Indeed, this same argument was rejected in *Gray v. St. Martin's Press, Inc.*, 1999 WL 813909 (D.N.H. May 19, 1999), *aff'd*, 221 F.3d 243 (1st Cir. 2000).  Plaintiff, a Washington lobbyist, argued that he could not be a public figure because "several editors and other employees at St. Martin's Press who actually worked on [the book] admitted … that, prior to their involvement with the book, they had never heard of" him.  *Id.* at *2.  While the court agreed that the plaintiff was not a "household word" and therefore not a general purpose public figure, it found that it was "equally clear that plaintiff [had] attained the status of 'limited public figure'" due to his participation in the public controversy over "the influence of, and access provided to political figures by, powerful Washington, D.C., lobbyists." *Id.* at *2-3.

The fact that certain ICG employees did not know plaintiff prior to publication is not determinative of his public figure status.  Of course, those primarily responsible for Report No. 145's analysis – James Lyon and Nicholas Whyte – were indeed familiar with the plaintiff, as is set forth in detail in ICG's summary judgment motion.  *See* Dkt. No. 148 (referred to herein as "ICG's S.J. Br.") at 31-34 & n.20; *id.* at 36-42; *see also* ICG's Statement of Undisputed Material Facts ("SUMF") ¶¶ 69-88, 90, 97.[2]

_____

[2] In each of Zepter's briefs, he attempts to attach legal significance to the fact that all of ICG's personnel should have been familiar with Zepter but were not.  *See* Pl's 1st S.J. Br. at 9-10; Pl's 2d S.J. Br. at 12-13.  Putting aside that the persons identified by Zepter – ICG's D.C.-based senior vice president and special advisor on Latin America (Schneider), his deputy director (Ward) and his advocacy officer (Leonard), responsible for Washington, D.C. advocacy for all

In any event, Zepter is widely known.  His omnipresence throughout Europe, based upon his phenomenal business success and efforts to keep his family and corporate name – *Zepter* – in the public eye, whether through promotional or philanthropic efforts, is relevant to a limited purpose public figure analysis.  *See* Pl's 1st S.J. Br. at 30-33.  Such criteria are among the "guideposts [that] bear on the public figure inquiry."  *OAO Alfa Bank*, 387 F. Supp. 2d at 44-45. *See, e.g., Tavoulereas*, 817 F.2d at 773 (fact that plaintiff is "president and chief operating officer of one of the world's largest multinational corporations" is relevant to "whether that person has 'invite[d] attention and comment' with respect to public issues affecting his business dealings"); *Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45, 49 (D.D.C. 1997) (plaintiff's "impressive resume is a factor in his public figure status").  In this case, where the

---

reports; New York-based vice president for multilateral affairs responsible for UN advocacy for all reports (Soderberg); Brussels-based vice president for operations and administration (Deletroz); vice president of research and publications (Greenwald) and president and CEO (Evans), in each case with respective responsibilities for the entire organization; a former D.C.-based intern who spent a semester at ICG before starting her military career (Fletcher); and a communications director who did not join ICG until months after Report No. 145 was published (Stroehlein) – were not the reporters and drafters of Report No. 145, they were not even based in, or assigned to analyze, the Balkans at all.  *See* Deposition of Jonathan Greenwald at 251:20-255:7 (testifying that he did not possess specific knowledge about Zepter, which would be the province of ICG's "experts . . . working for us on the Balkans," "James Lyon, Nicholas Whyte") (attached hereto as Exhibit 2 to the Declaration of Michael D. Sullivan filed contemporaneously herewith).  The persons who were responsible for Report No. 145, its primary author, James Lyon, and Lyon's Brussels-based supervisor, Nicholas Whyte, the director of European programs who served as the report's editor, were familiar with Zepter.  *See, e.g.*, Declaration of James Lyon ("Lyon Decl.") ¶¶ 43-48 (Dkt. No. 148-2); Declaration of Thomas Curley ("Curley Decl.") Ex. 21 (Whyte Dep. at 351:19-352:7) ("I was aware that he was a very well-known businessman in the Balkans. … His banking activities were coming into focus.  I lived in the Republika Srpska in Bosnia myself for 16 months, so I was aware of the political environment there and I noted with interest when Mr. Zepter's bank moved into Republika Srpska, I think sometime after I left, but I was still following the news.");  Sullivan Decl. Ex. 3 (Whyte Dep. at 369:4-370:7) ("of course I was aware of Mr. Zepter as a significant economic actor in the Balkan economic political space at the time . . . I knew that from having lived there and having then read news reports as well after I had moved away.").  Plaintiff therefore misses the mark when he claims that the other ICG personnel should have known about Zepter, argues that their lack of specific knowledge affects the limited public figure analysis, and dismisses the relevant knowledge possessed by the persons who did in fact report, draft and edit Report No. 145, namely Lyon and Whyte.

plaintiff was literally "a household name," due to the popularity of Zepter cookware in kitchens throughout Europe, it is wholly appropriate for the court to factor the plaintiff's business success and overall societal prominence into the "public figure" mix.  As ICG has set forth in detail in its summary judgment brief which is incorporated herein by reference, ICG's S.J. Br. at 3-7, 13-16, Zepter's efforts to keep himself, his family and his businesses in the public eye provide cogent evidence of two of the "touchstones" of the public figure analysis set forth in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 (1974).

II.    **ZEPTER MISAPPREHENDS THE LIMITED PURPOSE PUBLIC FIGURE ANALYSIS**

A.    **Identifying The Pre-Existing Public Controversy**

Zepter concedes what ICG has argued in its motion for summary judgment:  prior to the publication of Report No. 145 in July 2003, there was an ongoing public controversy "concerning Serbian political and economic reform and integration into international institutions."  *Compare, e.g.*, Pl's 1st S.J. Br. at 15-17, *with* ICG's S.J. Br. at 16-19.  However, the plaintiff argues that this debate only began in March 2003, after the assassination of Prime Minister Zoran Djindjic.  But this is incorrect:  the record clearly establishes that this public controversy had been ongoing for years, beginning no later than 2000, when Vojislav Kostunica and Djindjic were elected President and Prime Minister, respectively, and Slobodan Milosevic was ousted from power.  *See* ICG's S.J. Br. at 16-19; SUMF ¶¶ 160-74.

Zepter's erroneous characterization of the nature and scope of the pre-existing public controversy is, in part, the result of a faulty methodology.  Specifically, to determine the contours of the controversy, Zepter looks no further than the four corners of Report No. 145.  However, while an examination of the topics addressed in the challenged publication is certainly relevant to the first step in the *Waldbaum* analysis, it is not the sum total of the inquiry.  Rather, in determining whether a controversy existed prior to the publication of the challenged statements, the court also "must examine whether persons actually were discussing some specific question," and should consider "if the press was covering the debate, reporting what people were

saying and uncovering facts and theories to help the public formulate some judgment. … If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980) (citations and footnotes omitted).  In other words, the nature and scope of the public controversy is determined by looking beyond the content of the challenged publication, which must be viewed in a larger context, so as to assess how the words on the page relate to what was being discussed in the public square.

It is not surprising that plaintiff fails to cite any legal authority for the premise that the nature and scope of the public controversy is found exclusively within the metes and bounds of the challenged publication.  A review of leading cases confirms that courts routinely look beyond the challenged article to isolate the pre-existing public debate:

In *Waldbaum*, 627 F.2d at 1299, the D.C. Circuit looked to the numerous news reports about the proliferation of businesses known as "cooperatives" in the supermarket industry to determine that "public controversies existed over the viability of cooperatives as a form of commercial enterprise and over the wisdom of various policies that [plaintiff's former employer] in particular was pioneering."  627 F.2d at 1299.  This pre-existing press coverage demonstrated the existence of a public controversy about this business model, and defendant's news article about plaintiff's dismissal from the cooperative he had led was deemed part of that public controversy.  *Id.*

In *Tavoulareas*, the court relied heavily on news coverage in identifying two public controversies:  the "broadly-defined" "national controversy over the state of the oil industry" as well as "a more narrowly defined controversy concerning the … arrangement" between Mobil Corporation and two other companies in the oil industry.  817 F.2d at 773-74.  With respect to the first, the court observed the voluminous published news articles on the state of the oil industry, as well as congressional hearings at which plaintiff himself testified.  *Id.*  With respect to the narrower controversy over Mobil's business arrangement, the D.C. Circuit agreed with the

district court that it "attracted the attention of journalists and government officials long before" the challenged article. *Id.* at 774.

In *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 950 (D.D.C. 1976), the court found that prior to publication there was a public controversy about the propriety of Pentagon employees being entertained by defense contractors. It reached this conclusion based upon the fact that the issue attracted the attention of public officials as well as the attention of the press. *Id.* at 950-54.

In *OAO Alfa Bank*, 387 F. Supp. 2d at 43, the court determined that the "rise of the oligarchs and the decline of the Russian economy into what one observer described as a 'criminal-syndicalist state'" was a public controversy, based upon the fact that the topic was discussed "in the media, classrooms, think tanks" and by government officials.

In the instant case, the record is clear: the public debate concerning Serbian reforms and Western integration was well underway before Djindjic died, and went back at least as far as the Serbian national elections in 2000. Indeed, Djindjic's entire tenure as Prime Minister was inextricably linked to this very critical public issue: would he be the one to move Serbia in the direction of Western reforms or would he be outdone by his political counterweight Kostunica, or undone by some of his dubious allies? The notion that the public controversy concerning Serbian reform began only after Djindjic's death simply flies in the face of the historic record.

As set forth in greater detail in ICG's motion, Djindjic's political career is treated by commentators and historians alike as virtually synonymous with a democratic movement to institute Western reforms in a nation darkened by years of ethnic strife and war. *See* ICG's S.J. Br. at 17-19; *see also* SUMF ¶ 162. Miodrag Vlahovic, Montenegro's Ambassador to the United States (2006-2010) describes the public controversy:

> [A] heavily publicized debate in a large segment of the Serbian public *developed and persisted throughout the administration of Prime Minister Djindjic –* concerning both his domestic and foreign policies. Given the political constellation, many supporters of Djindjic and many foreign observers (myself included) *viewed him as the leading force and best hope for achieving democratic reform and restoring Serbia as a decent democratic society* and as a country that

6

would regain a place of respect among the nations in the Balkan region, in
Europe, and globally, after the tragic destruction of that country in the years of
war and conflicts in the former Yugoslavia.

Curley Decl. Ex. 8 (Vlahovic Report ¶ 15) (emphasis added) (Dkt. No. 149-3).

Ambassador Vlahovic explains that one aspect of the debate involved the "sharp and
fundamental" differences between Djindjic and Kostunica that "surfaced almost immediately"
and continued throughout their years in power.  "The inherent conflict between Djindjic and
Kostunica had drastic and long-term negative consequences in Serbian society, including the
impact on the ideology and policies of the Serbian political elite."  *Id.* ¶ 10.

Balkan historian Florian Bieber echoes this assessment:

> Djindjic was a controversial politician throughout his career.  Although he was
> perceived by many as a reformist dedicated to restoring Serbia to a place among
> the nations of the world, nationalist politicians, including Serbian President
> Vojislav Kostunica, attacked Djindjic for his pro-Western orientation and his
> strong links to Germany.  At the same time, liberal opposition figures criticized
> Djindjic's willingness to cooperate with nationalists and the new tycoons who had
> become rich during the Milosevic era.  *The controversy about Djindjic was a
> mainstay of public debate and discussion in the media, on television, in diverse
> social and political circles, and on the streets of Serbia ... .*

*Id.* Ex. 9 (Bieber Report ¶ 27) (emphasis added) (Dkt. No. 149-4); *see also id.* ¶ 29.

The last United States Ambassador to the former Yugoslavia, William Montgomery, in
his political memoir "Struggling With Democratic Transition:  After the Cheering Stops," details
Serbia's struggle to institute meaningful reforms after the ouster of Milosevic and the key role
Djindjic played in that movement while Prime Minister.  Montgomery devotes a full chapter
analyzing the rivalry between Djindjic and Kostunica including the impediments to progress,
some placed in the way by Djindjic's political foes and others by his political allies.

> There are a variety of ways to look at the events *over the next two years [2001-
> 2003].  I saw it fundamentally through the prism of the conflict and struggle for
> power between [Kostunica and  Djindjic].*  This conflict would have terrible
> consequences for Serbia:  slowing down its democratic transition … leading both
> sides to take measures and methods which would discredit them in the eyes of the
> public and the international community … .

> The conflict between the two was no surprise.  It was inevitable and entirely predictable … .  At the heart, the DS put first priority on rapid movement towards the West, including the EU.  The DSS put first priority on maintaining a strong Serbia … and not becoming beholden to the West. …
>
> *The first major conflict between the two happened in the immediate aftermath of [the elections]*.  Djindjic … wanted to have a genuine revolution and act quickly … to create a new Serbia anchored to the West, and far more modernized. … Kostunica refused to allow it, insisting there had to be an evolution done strictly according to law.

*Id.* Ex. 125 at 6-8 (William Montgomery, Struggling with Democratic Transition:  After the Cheering Stops) (Dan Graf, 2010) (emphasis added) (Dkt. No. 154-22).

Plaintiff's notion that the controversy over Serbian economic and political reform began only after Djindjic's assassination is also belied by the testimony of his witnesses.  For instance, a Zepter protégé who, in her earlier capacity as senior ranking official during the Djindjic premiership, worked with lobbyist James Denton on Djindjic's visits to the United States, testified that, following the overthrow of Milosevic, a "huge dispute" emerged in Serbia about the direction and extent of political, economic, and social reforms.  *Id.* Ex. 14 (Joksimovic Dep. at 80:8-81:5) (Dkt. No. 149-9).  Similarly, it is clear from the testimony of Djindjic's head of state security that the debate over the "future" of Serbian reforms was going on during Djindjic's lifetime:

> The entire Djindjic government and all his close associates [bore the brunt] of this media attack.  It was done by Kostunica and the people around him.  They were doing everything they could to stop reforms and democratization of the country.  And Kostunica just wanted for Milosevic not to be there, but he didn't want anything else to change; he just wanted Milosevic to be gone and he wanted to replace him, that was all.

*Id.* Ex. 17 (Goran Petrovic Dep. at 29:2-11) (Dkt. No. 150-2).

Additionally, media reports show that the tug of war between Djindjic and his political rivals regarding the course of democratization and its attendant reforms was being discussed from the start of his premiership.  *See, e.g.*, *id.* Ex. 29 (Steven Erlanger, *The Balkans Are Still Trouble*, N.Y. TIMES, Dec. 3, 2000) (reporting that "Yugoslavia has moved to a new stage, with a new hidden drama" and quoting one analyst's explanation of the tension between Serbia's two

8

leading post-Milosevic figures:  "Kostunica regards Parliament as a cathedral" and "Djindjic regards it as a casino") (Dkt. No. 151-7); Sullivan Decl. Ex. 1 (*Zoran Djindjic:  Crusader for Reform*, BBC, Dec. 24, 2000) ("Mr. Djindjic has already feuded with the more cautious but highly popular Yugoslav President, Vojislav Kostunica."); Curley Decl. Ex. 32 at 1 (N.N., *You Just Watch Him*, REPORTER, Jan. 31, 2001) ("Much better positioned than the new Serbian Prime Minister are the 'players' for whom even the sparrows know that he is in conflict with:  Vojislav Kostunica, who won almost unconditional popularity of the vast majority of citizens.") (Dkt. No. 151-10); *id.* Ex. 48 at 2 (Dragoslav Grujic, *Their Clash with Themselves*, VREME, Sept. 20, 2001) (cataloguing charges against Djindjic's party over "a lag in the implementation of reforms") (Dkt. No. 152-11); *id.* Ex. 82 at 2 (Milos Miloradovic, *Searching for the Origin of the Money*, DANAS, June 24, 2002) (Djindjic's controversial reform effort "has attracted public attention" because of exemptions for certain tycoons from the extra-profits tax) (Dkt. No. 153-14).

The debate continued to figure prominently when Djindjic and other Serbian leaders entered discussions with top American officials during visits to Washington, D.C. in 2001.  *See, e.g.*, *id.* Ex. 37 (*Exclusive Interview with Zoran Djindjic, Prime Minister of the Republic of Serbia*, John McLaughlin, July 13, 2001) (Djindjic interviewed about stability and reform in Serbia) (Dkt. No. 151-15); *id.* Ex. 41 at 1 (*The Belgrade Connection*, FINANCIAL TIMES DEUTSCHLAND, Aug. 13, 2001) ("[Djindjic] has long been considered in the west to be a guarantor of democracy in the Balkans.") (Dkt. No. 152-4); *id.* Ex. 44 at 1 (Sarah Means, *Yugoslavia After Milosevic; Power Struggles, the Mafia and Gradual Reform*, WASHINGTON TIMES, Aug. 23, 2001) (observing that rumors of underworld connections and political power struggles "have challenged [Djindjic's] reform efforts") (Dkt. No. 152-6); *id.* Ex. 55 (*Zoran Djindjic Talks About Kosovo Policy*, ALL THINGS CONSIDERED (NPR), Nov. 7, 2001) (Djindjic: "We are in transition. … [W]e have many people from Milosevic era in important places and important institutions, but we will do what is necessary to do to develop democracy.") (Dkt. No. 152-18); *id.* Ex. 54 at 2 (Jeffrey Donovan, *Yugoslavia: Serbian Prime Minister Seeks Greater Economic Assistance*, RADIO FREE EUROPE, Nov. 6, 2001) (reporting that Djindjic is "battling a

rising tide of popular and political resistance to reforms that he calls vital to the region's future")
(Dkt. No. 152-17); *id.* Ex. 76 at 2 (Milorad Ivanovic, *Zoran Djindjic Paid Only for
Transportation and Hotel in the USA*, *Djilas Recommended Kostunica to the Americans*, Blic,
Feb. 20, 2002) (recounting "one-upmanship" between dueling political leaders during rival U.S.
visits) (Dkt. No. 153-8).

The public controversy was so topical during this period that an American polling firm,
retained by an NGO, conducted a 2002 poll of the Serbian public, with questions about the future
of Serbia and reform efforts. *Id.* Ex. 79 at 2 (*Serbian Swing Voters Are Patient, But Angry About
Corruption and Fearful of Political Conflict*, Nat'l Democratic Institute for Int'l Affairs,
Mar. 2002) (democratic opposition party voters "are largely patient about the pace of reform –
notwithstanding large concerns about the economy, their distaste for squabbling within the
governing coalition, and the persistence of corruption and other ailments….") (Dkt. No. 153-11).
Thus, there is no question that the public controversy identified by Zepter (and by ICG) began
long before Djindjic's death in March 2003.

In attempting to limit the scope of the controversy, Zepter not only blinds himself to the
events in the public square, he also urges a reading of Report No. 145 that is myopic in the
extreme. A fair reading of the Report shows that its analysis of the changes put in place in the
immediate aftermath of the Djindjic assassination is not made, indeed cannot be made, in a
vacuum. Rather, recent events are placed in context: where Djindjic tried to take Serbia before
his untimely death is essential to any cogent discussion of the likely fate of the reform movement
after his death. As the Report begins:

> In the immediate aftermath of the shooting, public commitments to cooperate with
> The Hague Tribunal were made; the army began to be put under civilian control;
> the highest-profile organised crime gang and parts of the Milosevic-era parallel
> security structures were dismantled; several dozen prominent murders, many
> dating back to the old dictator's time, were solved; and the new union of Serbia
> and Montenegro was admitted to the Council of Europe. All of this should have
> happened quickly after Milosevic's fall in October 2000, but the reform agenda
> had been blocked by nationalistic forces around former Yugoslav President
> Vojislav Kostunica until February 2003… .

10

As welcome as that burst of activity was, however, new troubling signs have appeared. The government has yet to reveal who ordered a number of high profile political assassinations widely considered to have been associated with State Security. The newly appointed chief of military intelligence has been implicated by testimony at The Hague Tribunal in a massacre of 129 civilians during the 1999 Kosovo crisis ….

The government still appears to be unable to pursue reforms energetically since it remains excessively dependent on a Milosevic-era financial oligarchy and faces strong obstruction from a largely unreformed state security (BIA) and army sector….Indeed, it increasingly appears that the Democratic Party (DS), the power in the ruling DOS coalition, may have used the assassination and state of emergency not to set Serbia on a fast course forward but to settle political scores.

Curley Decl. Ex. 1 at 1 (Report No. 145) (Dkt. No. 148-6).

The Report shifts its focus throughout, between the past, present and future of the reform movement.[3] For instance, in the section containing the challenged statements, the Report states one of its theses contextually:

While Djindjic was alive, there was someone with a strong personality and desire for reform who was able to balance the competing interests in the coalition. In today's Serbia, no single politician possesses the same authority. The special interests seem increasingly able to block reforms and maintain the status quo, or, in some instances, actually revert back towards the old system. … [T]he increasing indebtedness of the DS and the DOS [political parties] to Milosevic's financial oligarchy, have created an environment where change will not occur, absent significant outside pressure and the fresh impetus created by new elections."

*Id.* at 17. The section goes on to detail the course of reform efforts and setbacks between 2000 and July 2003. *Id.* at 17-25.

In sum, Report No. 145 provides a wide retrospective of the reform movement that had occupied the public discourse since the Serbian people ousted Milosevic in favor of a new national future, and that faced new challenges without its charismatic leader, Prime Minister Djindjic.

---

[3] The Report's review of past and current events, and the path towards future reforms is set forth in four substantive sections: "Achievements," "Backward Steps," "Why the Government Can't Continue Reforms" and "Election Politics."

Thus, when the challenged publication is given a fair reading, and is viewed in context –
what "the press was covering" and "what people were saying," *Waldbaum*, 627 F.2d at 129 – it is
clear beyond peradventure that the public controversy – which both parties agree was concerned
with "Serbian political and economic reform and integration into international institutions" –
began no later than 2000.

> **B.      The Record Establishes That Zepter Voluntarily Participated In The Public
> Controversy Concerning Serbian Political And Economic Reforms**

Plaintiff argues that he did not participate in the public controversy concerning Serbian
political and economic reforms and, therefore, he is not a limited purpose public figure.  Plaintiff
offers several rationales in support of this contention.  None are sufficient to evade his public
figure status.

> **1.      The fact that plaintiff did not figure prominently in Report No. 145
> does not mean he did not participate in the public controversy**

With regard to the first prong of the *Waldbaum* analysis, Zepter argues that the nature and
scope of the public controversy is circumscribed by the content of Report No. 145, without
reference to activity in the public square.  He urges a similar and equally erroneous approach to
the second prong of *Waldbaum*, to wit, that the measure of his voluntary participation in the
public controversy is determined by how prominently he figures in Report No. 145.  Thus,
plaintiff claims that, because he is mentioned less frequently in the Report than are other Serbian
oligarchs, this establishes his tangential role in the debate over Serbian reforms.  Not
surprisingly, plaintiff cites no legal authority for this flawed proposition.  *See* Pl.'s 1st S.J. Br. at
18-20.

Even a cursory analysis of *Waldbaum* and its progeny show that courts assess a libel
plaintiff's voluntary participation in a public debate by evaluating if the plaintiff weighed in on
the issues implicated in the public debate, whether by his actions or his words,  by accessing the
media or by otherwise occupying the public square.  The plaintiff's prominence in the challenged
publication is not necessarily an accurate gauge of his participation in the public debate.  For

instance, if an article examined the pros and cons of states relying on revenue from gambling operations, and focused on Steve Wynn's operations in Nevada, devoting only one paragraph to Donald Trump's operations in New Jersey, would a court conclude that Trump was not a voluntary participant in the debate concerning legalized gambling?  Clearly not.

Indeed it is often the case that a libel plaintiff alleges reputational harm from a challenged publication that had some other person or entity as its primary focus.  Thus, in *OAO Alfa Bank*, 387 F. Supp. 2d at 37-39, 42-43, the challenged article, entitled "Cheney Led Halliburton to Feast at Federal Trough," was primarily concerned with the likely advantage that would inure to Halliburton if the Bush-Cheney ticket won the 2000 presidential election.  The article examined the correlation between the amount of political donations made by Halliburton and the number of government contracts awarded to the company when Cheney was its CEO.  The article noted that Halliburton had a proven ability to influence governmental decisions that had a positive effect on the company's bottom line.  By way of example, the article discussed lobbying efforts that had caused the EXIM Bank to reverse its denial of a loan to Tyumen Oil, plaintiffs' oil company, for a project that was worth millions to Halliburton.  The article explained that some officials were disinclined to underwrite the plaintiffs, Russian oligarchs who had been linked to organized criminal activity, including money laundering and drug trafficking.  The fact that the plaintiffs were not the main focus of the article did not factor into the court's conclusion that they were limited purpose public figures.

Similarly, in *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1078-79 (3d Cir. 1988), the plaintiff alleged he was harmed by an article about Labor Secretary Raymond Donovan, arising from allegations that Donovan cut deals with mobsters prior to joining President Reagan's cabinet, and while he was a part owner in the plaintiff's construction company.  The article reported that certain FBI files which had not surfaced during Donovan's confirmation hearings revealed that the plaintiff's name appeared in bureau reports concerning the disappearance of James Hoffa.  Once again, the fact that Donovan was the primary subject of

13

the article, rather than the plaintiff, did not figure in the court's analysis.  Rather, it was the plaintiff's close ties to Donovan that militated in favor of his public figure status.

Simply put, the question whether Zepter voluntarily participated in the public controversy is not answered by tallying up how many times he is mentioned in Report No. 145.

> ### 2. Although Zepter contends that his relationship with Prime Minister Djindjic was of a "private" nature, their alliance was actually a matter of common knowledge and public concern

As stated earlier, Zepter agrees that prior to July 2003, there was an ongoing public controversy concerning Serbian reforms.  Further, he readily admits that he had a close personal relationship with Prime Minister Djindjic, and that he supported his friend's political objectives by, among other things, paying American lobbyist James Denton who represented the Prime Minister as he advanced the Serbian cause in America on matters that were critical to the country's ability to move forward on reforms.  *See* Pl's 1st S.J. Br. at 20-21.

Plaintiff maintains, however, that his relationship with Djindjic was a "private" friendship, and that his payment of $120,000 in lobbying fees was a "mere" favor to "help his friend," and that neither circumstance thrust him into the public debate concerning Serbian reforms.  *Id.* at 20.  But, as the record reflects, this is simply not true and, in fact, under different circumstances, the plaintiff has stated otherwise.

Zepter's characterization of his close friendship with Prime Minister Djindjic as private is disingenuous at best, and simply does not square with the historic record.  Indeed, it does not even square with plaintiff's own telling of events.  The record establishes that the alliance between the two men was a matter of common knowledge.  Moreover, the general public was well aware of the favors Zepter conferred upon Djindjic, and raised questions about favors the Prime Minister gave his friend in return.  Thus, the alliance between the two men was widely known and was the subject of public discourse and controversy:

- For instance, Aleksandra Joksimovic, who served as Assistant Minister of Yugoslav Foreign Affairs during Djindjic's premiership, knew that Zepter and the Prime Minister were good friends.  Indeed, Djindjic spoke to her about Zepter

obtaining a diplomatic passport.  She also knew that Zepter agreed to serve on the Serbian Olympic Committee as a personal favor to Djindjic.  Curley Decl. Ex. 14 at 76:12-78:1 (Joksimovic Dep.) (Dkt. No. 149-9); *id.* at 108:8-111:19.

- The purportedly private relationship was reported in the press.  Thus, there were news reports that took note that the Prime Minister had been given access to one of Zepter's private jets.  *Id.* Ex. 33 at 4 (*Presidents, Prime Ministers and Trailer Trucks*, NIN, May 31, 2001) (Dkt. No. 151-11); *id.* Ex. 34 (News Release, SPO, June 13, 2001) (Dkt. No. 151-12).

- Some news reports questioned whether Zepter was being afforded business advantages as a consequence of his close relationship with Djindjic.  *Id.* Ex. 39 at 1 (Marko R. Petrovic, *Only a Pot Can Save a Serb*, BLIC, June 27, 2001) (Dkt. No. 152-2); *id.* Ex. 62 at 6 (*Democratic Party Gave Away Land That Was Expropriated From the Serbian Orthodox Church and Patriarch Varnava to the Wealthy Philip Zepter, a Personal Friend of Zoran Djindjic*, SRPSKA REC, Dec. 9, 2001) (Dkt. No. 152-25); *id.* Ex. 61 at 2-3 (*Transparent (Clearance) Sales*, NIN, Nov. 29, 2001) (Dkt. No. 152-24).

- Most certainly, Zepter's payment to an American lobbyist was not a private matter.  Rather, Zepter's underwriting of Djindjic's efforts in the United States was the subject of press accounts, which reported the arrangement with some skepticism.  *Id.* Ex. 35 at 4 (Milorad Ivanovic, *Djindjic's Promotion in USA is Financed by Zepter*, BLIC, June 22, 2001) (Dkt. No. 151-13); *id.* Ex. 43 (*In Focus: The Zepter State*, BH DANI, Aug. 17, 2001) (Dkt. No. 152-7); *see also id.* Ex. 92 (*Zepter Was Paying the Serbian Government's Lobbyists*, BALKAN, July 18, 2003) (Dkt. No. 153-24).

- Zepter did not treat the relationship as a private matter:  he spoke openly in the press about his friendship with Djindjic, *see id.* Ex. 27 (*How Milan Jankovic Became Philip Zepter:  The Last Serbian Name the Whole World Still Trusts*, PROFIL (Belgrade), 1999) (Dkt. No. 151-5), and in his open letter to the Serbian populace, *see id.* Ex. 66 (*My Answer to Them*, POLITIKA, Dec. 31, 2001-Jan. 2, 2002) (Dkt. No. 152-29).  Indeed, Zepter publicly proclaimed:  "I have known Mister Djindjic for many years, and I still proudly say that we are friends." *Id.*

### 3. Zepter's voluntary association with Djindjic thrust him into the public controversy

Zepter's close friendship with the Prime Minister and his concomitant involvement in

national politics inexorably drew him into the public controversy.  Indeed, he admitted as much

in the press.  In an article entitled "I Am Being Attacked in Serbia Because I Helped Djindjic,"

Zepter states that he "made many enemies by helping Zoran Djindjic come to power, for being

his close friend, and then, when he became Prime Minister, his adviser for international

economic business affairs." Curley Decl. Ex. 113 at 4 (*Exclusive: World King of Pots: I Am Being Attacked in Serbia Because I Helped Djindjic*, NACIONAL (Croat.), Sept. 30, 2004) (Dkt. No. 154-10).

He attributed media attacks against him to his support for Djindjic, and claimed the Prime Minister's opponents came after him "in a brutal and unscrupulous way, by trying to pin murders, support for terrorism, tax evasion, and weapon smuggling on me." *Id.* at 3. Zepter also attributed the Yugoslav Parliament's investigation into his alleged involvement in the murder of the federal minister of defense, Pavle Bulatovic, to his support of Djindjic. *See id.* Ex. 66 (*My Answer to Them*), *supra*.

In particular, the fact that he had paid for the services of an American lobbyist was reported in the press. Zepter's underwriting of Djindjic was viewed critically, and raised questions about whether Zepter had undue influence over Djindjic. The press dubbed him "the most important financier of the Serbian government." *Id.* Ex. 43 (*In Focus: The Zepter State*), *supra*. The import of Zepter's helping hand also reflected poorly upon Djindjic, reinforcing the narrative that the Prime Minister had a penchant to "deal with the devil" to achieve his objectives. *See* ICG's S.J. Br. at 20-21.

Thus, whether Zepter would have preferred his payment to an American lobbyist on behalf of his friend (and presumably his country) to be a private matter, as he now claims, is irrelevant to the public figure inquiry and in no way diminishes its significance as to whether he participated in the public controversy. *See Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (ruling that a defamation plaintiff was a public figure in part because "his group paid a lobbyist/public relations firm over $1 million"), *aff'd*, 259 F.3d 273 (4th Cir. 2001); *see also Patrick v. Cleveland Scene Publ'g LLC*, 582 F. Supp. 2d 939, 951 (N.D. Ohio 2008) (ruling that a defamation plaintiff was a public figure in part because he "retained a public relations firm to represent his interests in the controversy"), *aff'd*, 360 F. App'x 592 (6th Cir. 2009); *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 363, 365-66 (D. Vt. 1984) (ruling that a defamation plaintiff was a public figure in part because the company hired a "public

16

relations representative" in order "to influence and counter the adverse impact of the unfavorable publicity that attended the FDA investigation and subsequent litigation").

Indeed, his facilitation of Djindjic's Western strategy could not be more directly related to the public controversy – the success of the reform movement.  As set forth in detail in ICG's summary judgment motion, during Denton's tenure, Djindjic visited America on numerous occasions, and met with many officials, among them Secretary of State Colin Powell, National Security Advisor Condoleezza Rice and President George W. Bush, as well as with major media outlets.  *See* ICG's S.J. Br. at 8-9; SUMF ¶¶ 140-45.  Nothing was higher on Djindjic's agenda than securing the economic footing of his country.  To succeed, which he did, he needed the United States to agree to support Yugoslavia's efforts to write off billions of dollars in external debt owed western government creditors, commercial banks, the World Bank and the IMF, and to reschedule repayment of the billions in remaining debt on more favorable terms.  *See* Curley Decl. Ex. 51 (News Release, Embassy of the Republic of Serbia, *Prime Minister Djindjic Makes Official Visit to U.S.*, Nov. 5, 2001) (Dkt. No. 152-14); *id.* Ex. 54 (Donovan), *supra*; *id.* Ex. 56 (*Djindjic to Get Sizeable Debt Write-Off*, UPI, Nov. 11, 2011) (Dkt. No. 152-19).  Therefore, in a direct and concrete way, Zepter's payment facilitated Djindjic's ability to rid his country of a financial yoke, which was essential for its economy to move forward.

Finally, Zepter's involvement in the public controversy is further evidenced by the fact that he was targeted by his friend's political opponents.  As he put it, he was "the collateral damage of the political conflict with Djindjic."  *Id.* Ex. 126 (Ranko Pivljanin, *Philip Zepter's Portrait:  The King*, Blic, Aug. 6, 2011) (Dkt. No. 154-23); *accord id.* Ex. 114 at 4 (*The Challenge of Being a Businessman Over a Politician*, Europe, May 5, 2005) (Dkt. No. 154-11).[4]

---

[4]  Zepter objects to the court giving any consideration of his post-publication conduct in its *Waldbaum* analysis.  *See* Pl's 1st S.J. Br. at 26.  While the court's delineation of the nature and scope of the pre-existing public controversy properly focuses on a defamation plaintiff's pre-publication statements and actions, post-publication statements and actions may still be relevant to the public figure analysis.  In this case, after ICG's July 2003 publication, Zepter spoke to the press about events that occurred prior to July 2003.  Some of these statements concern matters of historic import, and clearly bear upon the public figure inquiry.  For example, ICG cites to a

Zepter accessed the media to come to Djindjic's defense, and to respond to his own accusers, securing a full page in one of Serbia's leading newspapers to send an "open letter" to the Serbian people to debunk charges he viewed as a direct result of his close alliance with Djindjic. *Id.* Ex. 66 (*My Answer to Them*), *supra*; *see Thompson*, 394 F.2d at 776 (political supporter who "did not confine himself to private discussion of the issues in the" campaign, but was prominent in "appealing for public support" was held to be public figure).[5]

In conclusion, it is clear that Zepter was a voluntary participant in the public controversy concerning Serbian reforms. He pursued a course of conduct that was likely to, and did, invite public attention and comment, based upon his involvement in national politics, including his

---

lengthy interviews Zepter gave to *Blic* in 2004 and *Europe* in 2005, during which he shared details of his close relationship with Djindjic, and reminisced about a poignant conversation they had on the last night of the Prime Minister's life. ICG's S.J. Br. at 12 (citing Curley Decl. Ex. 114 at 7) (*The Challenge of Being a Businessman Over a Politician*, EUROPE, May 5, 2005); *id.* Ex. 104 at 4 (*Philip Zepter: Last Hours with Djindjic*, BLIC, Mar. 9, 2004) (Dkt. No. 154-1). He also reiterated his views about Serbian reforms and politics, both past and present. Clearly, such "post-publication" statements which provide Zepter's retrospective view of events, including details of his past participation in the public controversy, are pertinent to the public figure analysis. Another example of post-publication materials that are clearly relevant to the issue of plaintiff's public figure status is a February 2004 Blic article that named the "300 Most Powerful People in Serbia." ICG's S.J. Br. at 6, 12 (citing Curley Decl. Ex. 103) (*300 Most Powerful People in Serbia*, BLIC, Feb. 28, 2004). Zepter placed third on the list, ranking even higher than President Kostunica, who placed fourth. *Id.* Obviously, Zepter's rank was necessarily earned as a result of his accomplishments and overall prominence in society during 2003, if not before. As noted by the court in *OAO Alfa Bank*, 387 F. Supp. 2d at 57, news articles published relatively soon after the challenged publication need not automatically be ignored when determining public figure status.

    [5] It is worth noting that evidence of occasions when Zepter used his proven ability to access the media to respond to allegations he viewed as unjustified, which ICG submits to establish public figure status, pre-date the publication of Report No. 145. *See, e.g.*, Ex. 66 at 1-2 (*My Answer to Them*, POLITIKA, Dec. 31, 2001 – Jan. 2, 2002). It necessarily follows that on those occasions Zepter was not "defending" himself in the media against ICG's publication, but was rather responding to other allegations made by other parties well before July 2003. Thus, Zepter's concern that his "subsequent denials" of ICG's publication be proffered to prove his public figure status is without merit. Pl's 1st S.J. Br. at 29-30.

alliance with the Prime Minister, and used his access to the media to respond to the comments

engendered by his actions.[6]

### 4.   Even if Zepter intended his dealings with the Serbian Prime Minister to remain private, it was foreseeable that the relationship would attract attention and engender controversy

The argument proffered by Zepter to shirk the public figure mantle is not novel.  Other

libel plaintiffs who have befriended politicians or celebrated figures have claimed that the

relationship was private and that they did not intentionally seek publicity for themselves or

otherwise promote the friendship, and thus they are not voluntary participants in the controversy.

But as plaintiff's counsel explains in his treatise on defamation law, this argument

presents "an altogether spurious defense,"[7] and courts have routinely rejected it, making clear

that "[t]he relevant question is not, as the [plaintiffs] argue, whether they intended their" actions

"to remain private, but whether they 'volunteered for an activity out of which publicity would

foreseeably arise.'"  *Lluberes*, 663 F.3d at 15 n.8  (quoting 1 RODNEY A. SMOLLA, LAW OF

DEFAMATION § 2:32 (2d ed. 2011)); *accord, e.g.*, *McDowell v. Paiewonsky*, 769 F.2d 942, 949

---

[6]  As is discussed in greater detail in ICG's summary judgment motion, Zepter's foray into politics was not limited to his support of Djindjic.  Over the years, he has spoken publically about running for President of Serbia.  *See* Curley Decl. Ex. 108 (R.D., *Philip Zepter Considers a Run for President of Serbia*, DANAS, May 17, 2004) (Dkt. No. 154-5); *id.* Ex. 107 (*Me for President*, KURIR, May 17, 2004) (Dkt. No. 154-4).  He also lent his support to Prime Minister Mladen Ivanic.  *Id.* Ex. 50 (*Bosnian Serb Party Says Serb Entity Ruled by Private Businessman*, BBC, Nov. 2, 2001) (Dkt. No. 152-13).

[7]  The full passage provides:  "Plaintiffs sometimes advance the argument that they cannot properly be classified as public figures because they did not 'voluntarily' invite media attention, even though they may have voluntarily engaged in the activity out of which the media attention arose.  Based on a popular misconception surrounding the public figure issue, this is an altogether spurious defense.  Of course many plaintiffs find media attention undesirable, particularly unflattering attention, and do not volunteer for it.  But just as the media is not permitted to bootstrap itself into creating its own defense by focusing attention on the plaintiff through the very speech alleged to be defamatory, the plaintiff is not permitted to avoid the strictures of the actual malice standard by protesting, 'I didn't want the attention.'  The proper question is not whether the plaintiff volunteered for the publicity but whether the plaintiff volunteered for the activity out of which publicity would foreseeably arise."  1 RODNEY SMOLLA, LAW OF DEFAMATION § 2:32 (2d ed. 2006) (footnote omitted).

(3d Cir.1985) ("the voluntariness requirement may be satisfied even though an individual does not intend to attract attention" if he "undertakes a course of conduct that invites attention"); *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow.  It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.").

Zepter's alliance with the Serbian Prime Minister is precisely the type of voluntary association that "invites public attention" and foreseeably runs the risk of being drawn into a public controversy, and the courts have so held:

In *Clyburn v. News World Communications*, 903 F.2d 29, 33 (D.C. Cir. 1990), the plaintiff was a businessman who had many social as well as professional contacts with various members of D.C. Mayor Marion Barry's administration.  Plaintiff was present when his girlfriend, who also enjoyed the same social ties, collapsed at a party and died from a drug overdose.  Plaintiff took exception to a news report that he had waited several hours before calling for an ambulance so that party goers could leave before the police arrived.  The court, noting the plaintiff's various connections with Barry administration officials, ruled that plaintiff was a limited purpose public figure.  "One may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy.  Clyburn engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy."  *Id.* at 33.

Similarly, in *Rebozo v. Washington Post Co.*, 637 F.2d 375 (5th Cir. 1981), the plaintiff was President Richard M. Nixon's close friend.  He sued the *Washington Post* for reporting that he had allegedly cashed in stolen stock.  The court held that the plaintiff was a public figure based upon the fact that he was Nixon's longtime confidant and advisor.  *Id.* at 380.

As is well known, Rebozo was President Nixon's closest friend while Nixon was in the White House.  While this in and of itself has considerable significance, we

need not decide whether a confidential relationship with the President of the
United States automatically converts one into a public figure, since the record
indicates Rebozo had in other ways voluntarily exposed himself to the risk of
close public scrutiny.  Rebozo played a substantial role in the former President's
financial affairs, acting as the President's agent in the management of the
President's bank accounts at the Key Biscayne Bank, and in the purchase of two
homes.  Plaintiff also played a role in the purchase and sale of other investments
for the former President. … Rebozo freely admitted he offered his opinions to
President Nixon on various matters [including] … the Watergate situation when it
began to arise in late 1973.

More significantly … Rebozo played an active role in the President's 1972 re-
election campaign, helping to arrange major contributions for the President's
political benefit.

*Id.* at 379.  The court also noted that the plaintiff's "business and financial dealings" were
followed closely by the press and reported on "in some detail," a phenomenon that Rebozo
candidly acknowledged:  "'[W]hen you are traveling in the circles that I have traveled in, there
are press people all over the place.'"  *Id.*

Like Rebozo, Zepter offered both personal and political support to his friend.  He was an
early endorser of Djindjic and supporter of his political aspirations; he shared his vision for a
new Serbia; he invested in Serbia at Djindjic's behest; he financed a U.S. lobbyist to enable
Djindjic to be better able to institute Western reforms; he spoke out in Djindjic's defense in the
press; he gave Djindjic use of his private jet; Zepter was the prime minister's adviser for
international economic business affairs; he served on the Olympic Committee at Djindjic's
request; he opened his home to Djindjic and his family, even spending the last night of Djindjic's
life with him.  And, just as was the case with President Nixon's confidant, Zepter's interactions
with Prime Minister Djindjic attracted press coverage.[8]

In *Schiavone Construction Co.*, 847 F.2d 1069 (3d Cir. 1988), the court held that
plaintiffs were limited purpose public figures based upon their relationship with Secretary of

---

[8]  In fact, the following passage from *Rebozo v. Washington Post Co.* would remain
accurate if "Zepter" was substituted for "Rebozo" and if "Prime Minister" was replaced with
"President":  "Press coverage of Rebozo has focused both upon his relationship to the President
and upon his own business and personal affairs, although the public's interest in his activities has
certainly been enhanced by his connections with the former President."  637 F.2d at 379.

Labor Raymond Donovan.  The court found that through his support of and public statements about his "close ties with [the former government official]," Schiavone "thrust himself into the controversy surrounding" the former Labor Secretary.  *Id.* at 1079.  The court rejected plaintiffs' argument, identical to the one Zepter advances here, that they never sought public figure status, "reiterat[ing] that" a plaintiff cannot "escape public figure status simply because he wished not to be one" and that "'the voluntariness requirement may be satisfied even though an individual does not intend to attract attention' if he 'undertakes a course of conduct that invites attention.'"  *Id.* at 1078 (citation omitted).  Instead, the plaintiffs had assumed the risk of public figure status when they chose to associate with and support "the U.S. Secretary of Labor, having been confirmed despite an avalanche of rumors of underworld ties, and so the underlying public controversy was a veritable vortex into which it was not difficult for Schiavone and SCC to be drawn."  *Id.*

### 5.       Zepter is mistaken:  ICG did not create the public controversy

Finally, Zepter argues that ICG cannot look to his participation in the public controversy – the future of Serbian reforms – as evidence of his public figure status because ICG created the controversy when it published Report No. 145.  As explained in *Lluberes*, 663 F.3d 6, bootstrapping "occurs when the defendant *relies on his own defamatory publication to manufacture a public controversy involving the plaintiff*, and thus 'by [his] own conduct, create[s] his] own defense by making the claimant a public figure.'"  *Id.* at 18 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (alterations in original) (emphasis added).  As the court emphasized:  "That is the logic behind the requirement that public-figure status – whether acquired for all purposes and in all contexts or derived from a particular controversy – predate the alleged defamation."  *Id.*

The public controversy identified by both Zepter and ICG is the debate concerning Serbian economic and political reforms.  As previously stated, ICG maintains that the controversy had been underway since 2000.  Zepter maintains the debate began when Djindjic

was murdered in March 2003.  *In either case*, the controversy clearly pre-dates ICG's publication of Report No. 145 in July 2003.

Further, Zepter admits in his "open letter" published to the Serbian people that, by 2001, Zepter had been Djindjic's friend for "many years" and had previously "helped in many ways not only the work of [Djindjic's party], but also other opposition activists and activities in Serbia."  Curley Decl. Ex. 66 at 2 (*My Answer to Them*), *supra*.  Earlier that year, Zepter became the financier of Djindjic's lobbying efforts with the United States government on behalf of the Serbian government.  Thus, key elements of plaintiff's voluntary participation in the controversy also pre-date Report No. 145.

Given this undisputed chronology, Zepter's argument that ICG's publication created the public controversy and that, therefore, ICG cannot proffer evidence of Zepter's participation in the controversy to establish his public figure status, is utterly nonsensical.  Report No. 145, while addressing the issue of Serbian reforms, certainly did not instigate the public debate, and there is no evidence in the record to show that it did.  In contrast, there is much evidence that the public debate was in full swing well before ICG's publication, and that Zepter was an active supporter of reform efforts for many years prior to July 2003.  Thus, this case simply does not fit the bootstrapping mold.

### C.    The Challenged Statement Is Germane To The Public Controversy

Plaintiff argues that he cannot be held to the public figure standard because the challenged statement is not sufficiently related to the public controversy.  Nothing could be further from the truth, and even a cursory review of the passage giving rise to the alleged defamation indicates that the public controversy – the fate of Serbian reform – is framed in the very first sentence:  to wit, that Serbian reforms were being impeded by the continuing "power of the Milosevic-era financial structures" who have become the new Serbian "oligarchy" by financing political parties and consequently wielding "tremendous influence over government decisions."  Curley Decl. Ex. 1 at 17 (Report No. 145), *supra*.  As stated earlier, and as set forth

in detail in ICG's Motion for Summary Judgment, Zepter's participation in the public debate is germane to the challenged publication: his Zepter Banka was a "Milosevic-era financial structure," he did finance Djindjic's efforts, and he did wield influence over the Prime Minister as both his advisor and confidant. *See* ICG's S.J. Br. at 25-26.[9]

## CONCLUSION

For all the foregoing reasons, as well as for those reasons set forth in defendant ICG's Motion for Summary Judgment (Dkt. No. 148), ICG respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment Affirming his Status as a Private Figure (Dkt. No. 145), and instead enter summary judgment in ICG's favor.

---

[9] Plaintiff also posits some of the same erroneous factual claims and legal arguments with regard to the "law of the case" doctrine herein as he proffered in his partial summary judgment motion on the issue of falsity. ICG has responded to Zepter's off-the-mark theories regarding the "law of the case" in its opposition to that motion, which response is incorporated herein by this reference. ICG's Opp. to 2d S.J. Br. at 6-20.

Finally, Zepter once again strains to wedge in attacks against James Lyon that are based on rank hearsay and which, in any event, have no place in a public figure analysis. Pl's 1st S.J. Br. at 27 n.4. ICG has previously responded to these utterly baseless charges that James Lyon tried to extort money from Stanko Subotic in exchange for a retraction from ICG, or from Zepter to exclude him from future ICG coverage. ICG's response has been set forth previously in its Opposition to Plaintiff's Motion for Declaratory Relief (Dkt. 127) at 28-30, which is incorporated herein by this reference.

Dated:  May 23, 2013

Respectfully submitted,


/s/ Michael D. Sullivan

Michael D. Sullivan, D.C. Bar No. 339101
Thomas Curley, D.C. Bar No. 473798
Levine Sullivan Koch & Schulz, LLP
1899 L Street, N.W., Suite 200
Washington, D.C.  20036
Telephone: (202) 508-1138
Facsimile: (202) 861-9888
Email: msullivan@lskslaw.com
Email: tcurley@lskslaw.com

Jonathan Greenblatt, D.C. Bar No. 449874
Shearman & Sterling LLP
801 Pennsylvania Ave., N.W., Suite 900
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile:  (202) 508-8100
Email: jonathan.greenblatt@shearman.com

Neil H. Koslowe, D.C. Bar No. 361792
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 508-8118
Facsimile:  (202) 508-8100
Email: nkoslowe@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused defendant International Crisis Group's Opposition to Plaintiff's Motion for Partial Summary Judgment Affirming his Status as a Private Figure, its Counter Statement of Undisputed Material Facts, the Declaration of Michael Sullivan and the exhibits thereto, to be filed and served electronically via the Court's ECF System upon counsel of record.


Dated:  May 23, 2013                    /s/ Michael D. Sullivan