## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MILAN JANKOVIC,                           )
                                          )
              Plaintiff,                   )
                                          )
       v.                                 )          Civil Action No. 04-1198 (RBW)
                                          )
INTERNATIONAL CRISIS GROUP,               )
                                          )
              Defendant.                   )
_____)

## MEMORANDUM OPINION

The plaintiff, Milan Jankovic, also known as Philip Zepter, brings this action to

recover damages for injuries allegedly caused by a defamatory publication circulated by

the defendant, the International Crisis Group.  There are several motions currently

pending before the Court:  (1) Plaintiff Philip Zepter's Motion for Partial Summary

Judgment Affirming His Status as a Private Figure ("Pl.'s Private Figure Mot."); (2)

Plaintiff Philip Zepter's Motion for Partial Summary Judgment Affirming the Falsity of

[International Crisis Group]'s Defamatory Statements ("Pl.'s Falsity Mot."); (3) Motion

for Summary Judgment of Defendant International Crisis Group ("Def.'s Summ. J.

Mot."); (4) Defendant International Crisis Group's Motion to Strike [the] Plaintiff's

Hearsay Declarations ("Def.'s Strike Mot."); and (5) Plaintiff Philip Zepter's Motion to

Strike the 2003 Expense Receipts of James Lyon ("Pl.'s Strike Mot.").  Upon careful

consideration of the parties' submissions,[1] the Court will deny the plaintiff's motion for

_____

[1]  In addition to the filings already mentioned, the Court considered:  (1) the Opposition of Defendant
International Crisis Group to [the] Plaintiff's Motion for Partial Summary Judgment Affirming His Status
as a Private Figure ("Private Figure Opp'n"); (2) Plaintiff Philip Zepter's Reply Memorandum in Support
of His Motion for Partial Summary Judgment Affirming His Status as a Private Figure ("Private Figure
(continued . . .)

partial summary judgment affirming his status as a private figure, deny the plaintiff's

motion for partial summary judgment affirming the falsity of International Crisis Group's

defamatory statements as moot, grant summary judgment for the defendant, grant the

defendant's motion to strike the plaintiff's hearsay declarations, and deny the plaintiff's

motion to strike the expense receipts as moot.

## I.  STANDARD OF REVIEW

A motion for summary judgment must be granted "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law," based upon the depositions, affidavits, and other factual materials in the

record.  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it "might affect the outcome of

the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  And "a dispute over a material fact is 'genuine' if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'"  Arrington v. United

States, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 247).  The

moving party bears the initial burden of showing the absence of a disputed material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If this burden is satisfied by the

---

(. . . continued)
Reply"); (3) the Opposition of Defendant International Crisis Group to [the] Plaintiff's Motion for Partial Summary Judgment on the Element of Material Falsity ("Falsity Opp'n"); (4) Plaintiff Philip Zepter's Reply Memorandum in Support of His Motion for Partial Summary Judgment Affirming the Falsity of [International Crisis Group]'s Defamatory Statements ("Falsity Reply"); (5) Plaintiff Philip Zepter's Memorandum of Points and Authorities in Opposition to [International Crisis Group]'s Motion for Summary Judgment ("Summ. J. Opp'n"); (6) the Reply of Defendant International Crisis Group in Support of Its Motion for Summary Judgment ("Summ. J. Reply"); (7) Plaintiff Philip Zepter's Memorandum in Opposition to Defendant International Crisis Group's Motion to Strike [the] Plaintiff's [Hearsay] Declarations ("Opp'n to Def.'s Strike Mot."); (8) Defendant International Crisis Group's Reply in Support of Its Motion to Strike [the] Plaintiff's Hearsay Declarations ("Def.'s Strike Mot. Reply"); (9) Defendant International Crisis Group's Opposition to [the] Plaintiff's Motion to Strike Expense Receipts ("Opp'n to Pl.'s Strike Mot."); and (10) Plaintiff Philip Zepter's Reply Memorandum in Support of His Motion to Strike the 2003 Expense Receipts of James Lyon ("Pl.'s Strike Mot. Reply").

moving party, the burden then shifts to the opposing party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. "Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citations omitted) (quoting Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this assessment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." Talavera, 638 F.3d at 308 (citing Anderson, 477 U.S. at 255). These inferences, however, must be "justifiable." Anderson, 477 U.S. at 255.

## II.    BACKGROUND

At the outset, the Court notes that the plaintiff has made it difficult to discern which purported material facts are in dispute.[2] See generally ECF No. 158-2, Plaintiff Philip Zepter's Statement of Genuine Issues of Material Facts in Opposition to Defendant [International Crisis Group]'s Motion for Summary Judgment ("Material Facts I") (disputing the defendant's proffered undisputed material facts). In response to many of the allegedly undisputed facts proffered by the defendant, the plaintiff raises a garden

---

[2]  The Court will primarily cite to the parties' submissions in connection with the defendant's motion for summary judgment, as that motion is dispositive and encompasses the relevant arguments made in the other motions before the Court.

variety of objections that do not genuinely dispute the truth of the undisputed facts

asserted by the defendant. For example, the plaintiff merely cites case law, therefore

making only legal arguments in many of its responses to the defendant's undisputed facts.

But legal arguments alone are insufficient to create a factual dispute to defeat a motion

for summary judgment. See Glass v. Lahood, 786 F. Supp. 2d 189, 199 (D.D.C. 2011)

("legal memoranda are not evidence and cannot themselves create a factual dispute

sufficient to defeat a motion for summary judgment"), aff'd, 11-5144, 2011 WL 6759550

(D.C. Cir. Dec. 8, 2011); see also Conservation Force v. Salazar, 715 F. Supp. 2d 99, 106

n.9 (D.D.C. 2010) ("arguments of counsel . . . are not evidence" (internal quotations and

citations omitted)).

The plaintiff also repeatedly uses qualifiers that do not genuinely dispute the truth

of the allegedly undisputed facts set forth by the defendant. Thus, when the defendant

cites Serbian press articles from the record as the evidentiary basis for its undisputed

facts, the plaintiff merely disputes those facts "to the extent they rely on an article from

the Serbian press which [the defendant] described as 'sensationalist bordering on libel'

and 'notorious for spreading [rumors] and outright lies.'" E.g., ECF No. 158-2, Material

Facts I ¶ 145 (quoting Pl.'s Private Figure Mot., ECF No. 145-4, Exhibit ("Ex.") 12 (July

2003 International Crisis Group Report Entitled "Serbian Reform Stalls Again" ("Report

145")) at 9-10). However, Report 145 does not reasonably suggest that these

characterizations are attributable to all publications of the Serbian press in the relevant

timeframe. See Pl.'s Private Figure Mot., ECF No. 145-4, Ex. 12 (Report 145) at 9-10.

Indeed, the primary researcher and author of Report 145 recognized that the accuracy of

the Serbian press articles had to be assessed on a "case-by-case basis." Def.'s Summ. J.

Mot., ECF No. 150-1, Ex. 16 (Deposition of James Lyon, Ph.D. ("Lyon Dep.")) at 22:6-15. Thus, where the plaintiff does not <u>specifically</u> dispute the facts from a particular Serbian press article by citing to evidence from the record, these facts remain uncontroverted.[3] <u>See</u> Local Civ. R. 7(h); <u>see also</u> <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145, 153 (D.C. Cir. 1996) (placing "burden on the parties to focus the court's attention on the salient factual issues in what otherwise may amount to a mountain of exhibits and other materials").

Alternatively, when the defendant cites Serbian press articles as the evidentiary basis for its undisputed facts, the plaintiff sometimes merely disputes those facts "to the extent they rely on a news article which is hearsay."[4] <u>E.g.</u>, ECF No. 158-2, Material Facts I ¶ 145. This objection is without merit under controlling precedent, as the defendant cites these articles for purposes other than the truth of the matter asserted. <u>See</u> Def.'s Summ. J. Reply, ECF No. 163-21, Response of Defendant [International Crisis Group] to Plaintiff Philip Zepter's Statement of Genuine Issues of Material Fact and His Response to [International Crisis Group]'s Statement of Undisputed Material Facts ("Resp. to Material Facts I") at 6-8. First, the articles assist the Court in identifying a public controversy, <u>Waldbaum v. Fairchild Publ'ns, Inc.</u>, 627 F.2d 1287, 1297 (D.C. Cir. 1980) ("The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some

---

[3] Some of the Serbian press articles contain interviews with or quotes from the plaintiff. <u>E.g.</u>, Def.'s Summ. J. Mot., ECF No. 151-3, Ex. 25; Def.'s Summ. J. Mot., ECF No. 151-5, Ex. 27. The plaintiff does not specifically contend that the Serbian press articles inaccurately reported what he publicly stated. In any event, as the Court will soon explain, the Serbian press articles cited by the defendant in support of its undisputed facts are not necessarily being used for the truth of the matters asserted.

[4] Because some of these Serbian press articles contain interviews with or quotes from the plaintiff, it is unclear to the Court why these are not at least party admissions that are not excluded under the hearsay rule. <u>See</u> Fed. R. Evid. 801(d)(2).

judgment.  It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.  If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." (internal footnotes omitted)).  And second, they aid the Court in determining the plaintiff's role, if any, in that public controversy.  Id. ("The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution.  In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements.").[5]

The plaintiff also objects to the defendant's proffered undisputed facts that rely on reports from the defendant's experts on hearsay grounds.[6]  E.g., ECF No. 158-2, Material Facts I ¶ 24.  But expert reports are an exception to the rule against hearsay in the summary judgment context.  See Fed. R. Evid. 802 advisory committee's note (listing "Rule 56: affidavits in summary judgment proceedings" as an exception to prohibition against hearsay).  The Court, therefore, can and will consider expert reports in resolving the parties' summary judgment motions, provided that the expert has "personal knowledge," "set[s] out facts that would be admissible in evidence," and "show[s] that

---

[5]  Nowhere does the plaintiff contest that these articles were actually published by the Serbian press.

[6]  The plaintiff repeatedly cites A-J Marine, Inc. v. Corfu Contractors, Inc., 810 F. Supp. 2d 168, 178 n.6 (D.D.C. 2011) and Mahnke v. Washington Metropolitan Area Transit Auth., 821 F. Supp. 2d 125 (D.D.C. 2011) in support of his argument that expert reports are hearsay.  But neither case is helpful on that point.  The Court in A-J Marine dealt with an "unsworn" report, 810 F. Supp. 2d at 178 n.6 (emphasis added), an issue that the plaintiff has not raised here.  And in Mahnke, the Court discussed expert reports as hearsay in the context of their use at trial.  821 F. Supp. 2d at 154.

[he or she] is competent to testify on the matters stated."[7]  Fed. R. Civ. P. 56(c)(4)); see

also Lohrenz v. Donnelly, 223 F. Supp. 2d 25, 37 (D.D.C. 2002), aff'd, 350 F.3d 1272

(D.C. Cir. 2003) (considering expert report in defamation case on summary judgment).

Finally, in those instances where the plaintiff deems many of the defendant's

purported undisputed facts as "immaterial," the Court will treat those facts as conceded,

as this response does not raise a genuine issue of material fact.[8]  See Herrion v.

Children's Hosp. Nat'l Med. Ctr., 786 F. Supp. 2d 359, 362 (D.D.C. 2011) ("irrelevant

and immaterial" challenges are "patently insufficient to controvert the truth of the matters

identified"), aff'd, 448 F. App'x 71 (D.C. Cir. 2011).  In sum, because the

aforementioned challenges do not controvert the truth of the defendant's proffered

undisputed facts, the Court will treat those undisputed facts as admitted.  See Local Civ.

R. 7(h) ("In determining a motion for summary judgment, the [C]ourt may assume that

facts identified by the moving party in its statement of material facts are admitted, unless

such a fact is controverted in the statement of genuine issues filed in opposition to the

motion.").  Against this backdrop, the Court finds that the following facts are undisputed.

### A.  Factual Background

#### 1.  The Parties

The plaintiff "was born in a small Serbian town and grew up in Bosnia."  ECF

No. 157-1, Defendant International Crisis Group's Response to [the] Plaintiff's Statement

---

[7]  To the extent the plaintiff disputes the competency of the defendant's experts to testify about certain subject matter, e.g., ECF No. 158-2, Material Facts I ¶ 99 ("Mr. Bieber also admitted having no knowledge of Zepter Banka, and is not qualified to testify as an expert on economic activity in Serbia."), the Court will not rely on those portions of the expert reports discussing those subjects.

[8]   The defendant has similarly done the same in response to purported undisputed material facts advanced by the plaintiff in his partial motions for summary judgment.  The Court will likewise treat those facts as conceded.

of Undisputed Material Facts ("Material Facts II") ¶ 1.  After college, he "established the Zepter Company, . . . a cookware company[.]"  Id. ¶ 2.  After the formation of his company, the plaintiff "achieved business success throughout Europe."  Id. ¶ 4.  The plaintiff's products can be found in more than forty countries.  See id. ¶ 5.

The defendant "is a non-profit organization founded in 1995 to help anticipate, prevent, and resolve deadly conflicts around the world."  ECF No. 158-2, Material Facts I ¶ 4.  In the early-to-mid 2000s, it "focused significant efforts" on the Balkans.  Id. ¶ 6.  In that regard, the defendant regularly publishes analytical reports intended to influence policymakers around the world.  Id. ¶ 9.

## 2. The Serbian Government During the Relevant Timeframe

In 1999, Serbia was marred by civil conflict as its President, Slobodan Milosevic, carried out violence in Kosovo—a province in Serbia.  See id. ¶ 31.  Milosevic's actions in Kosovo resulted in military intervention by the North Atlantic Treaty Organization ("NATO"), as well as economic sanctions by the United States and European countries. See id.  In 2000, Milosevic lost a democratic election to Vojislav Kostunica, see id. ¶ 32, and following Milosevic's ouster from power in Serbia, "there was a public discussion in Serbia about the direction and extent of political, economic, and social reforms," id. ¶ 161.  "The topic was a mainstay of public debate and discussion in the media, on television, in diverse social and political circles, and on the streets of Serbia."  Id. (internal quotations omitted); see also id. ¶ 37 ("When Milosevic fell at the end of 2000 for a number of years, there was a constant policy debate in the wider international community, and . . . within the [International] Crisis Group, about what was really going on in Serbia, [including whether Serbia] . . . was . . . really reforming [and] moving away

from the Milosevic period" (internal quotations and alterations omitted)). Despite Kostunica's victory over Milosevic, "political power was vested in the newly elected Serbian parliament and its [P]rime [M]inister, Zoran Djindjic." Id. ¶ 33. Kostunica and Djindjic would eventually become political rivals, with Djindjic "taking charge of the crucial levers of government in Serbia." Id. ¶ 34; see also id. ¶ 164 ("The future of Serbian reforms was of international concern, and prominent news publications regularly covered the issue."). "Djindjic was a reformist who favored sweeping change from the policies implemented by . . . Milosevic," but "Djindjic's political rivals, such as . . . Kostunica, advocated a policy of continuity." Id. ¶ 162. In 2001, Djindjic extradited Milosevic to The Hague, Netherlands, to stand trial for war crimes. Id. ¶ 35. Djindjic was assassinated in 2003. Id.

### 3. Press Coverage of Post-Milosevic Serbia[9]

#### a. Press Reports About Djindjic

After Milosevic was removed from power, "[t]here was intense interest in the international community and in the region as to whether Djindjic was committed to democratic reform and at what pace." Id. ¶ 34. Specifically, Western nations viewed Serbia as the "key to regional stability" in the Balkans. Id. The international community harbored some doubt as to whether Djindjic could reform Serbia and govern it differently than Milosevic. See Def.'s Summ. J. Mot., ECF No. 151-9, Ex. 31 (January 2001 Economist Article Entitled "Zoran Djindjic, Serbia's [O]ther [B]ig [M]an" ("January 2001 Economist Article") at 2 ("One of Serbia's leading columnists, by no means a fan of

---

[9] Many of the Serbian press articles have been translated into English. Any alterations made by the Court do not change the substance of the articles. For example, some alterations were made to correct grammatical errors.

Mr[.] Milosevic, calls Mr[.] Djindjic 'Little Slobo[,'] implying that he has the same dictatorial tendencies."); id. ("Years of sanctions and decades of communism have stunted the economy, and corruption is rife. If foreigners are to invest, the judiciary must be cleaned up, and the criminals who ran the show under Mr[.] Milosevic must be dealt with. Many well-wishers fear that Mr[.] Djindjic, who is far from monkish himself, may not be inclined to take them on."); id. at 3 ("Moreover, skeptics in Belgrade think [Djindjic] has already been too cosy with Mr[.] Milosevic's old crime-connected security-service types. . . . Mr[.] Djindjic has to be tough and shrewd. He also needs conciliatory skills—and integrity. He has the first two qualities in abundance. Whether he has the other two is worryingly less certain.").

For example, the Serbian press reported that the changes that Djindjic was "trying to introduce" in Serbia were "purely cosmetic and aimed at allowing the financial elite created during the Milosevic regime—representatives of whom are allegedly his close friends—to keep its positions and power . . . ." See Def.'s Summ. J. Mot., ECF No. 151-10, Ex. 32 (January 2001 Reporter Article Entitled "You Just Watch Him" ("January 2001 Reporter Article")) at 2. In particular, Djindjic's association with "business people" drew skepticism from the public. Def.'s Summ. J. Mot., ECF No. 152-4, Ex. 41 (August 2001 Financial Times Article Entitled "The Belgrade Connection" ("August 2001 Financial Times Article")) at 1 ("Today, Djindjic is Prime Minister – an international star. He has long been considered in the [W]est to be a guarantor of democracy in the Balkans. But behind this facade lurks a different, scarcely perceived side: Contradictions in which the Serbian government head has entangled himself, as well as contacts with business[]people that are classed as part of organized crime, cast dark shadows over the

purported shining light. . . . [T]his top politician has become involved with people who undermine his credibility."); see also id. at 2-3 (calling into question Djindjic's association with a "cigarette smuggler"). The public viewed Djindjic as a politician with "many complicated business interests . . . and many Serbs saw him as an elegant kingpin turned politician." Def.'s Summ. J. Mot., ECF No. 153-21, Ex. 89 (March 2003 Article Entitled "The World: Murder in Belgrade; Did Serbia's Leader Do the West's Bidding Too Well" ("March 2003 Article") at 1; see also Def.'s Summ. J. Mot., ECF No. 152-5, Ex. 42 (August 2001 Vreme Article Entitled "Murder, Corruption and Political Games" ("August 2001 Vreme Article")) at 3 ("It is understandable that . . . Djindjic's government with a European and reformist reputation does not like its standing being called into question."); id. at 6 ("Kostunica's mention of corruption in the media is usually interpreted as an attack of Djindjic . . . ." (internal quotations omitted)); Def.'s Summ. J. Mot., ECF No. 152-8, Ex. 45 (August 2001 www.nzz.ch Article Entitled "Europe [W]ill [N]ot [W]ait [F]or [U]s" ("August 2001 www.nzz.ch Article")) at 1 ("President Kostunica accuses the reformers of Serbian chief executive Djindjic of being interlinked with organized crime."); Def.'s Summ. J. Mot., ECF No. 153-13, Ex. 81 (Article From www.milovanbrkic.com Entitled "Birth of the Serbian Godfather" ("www.milovanbrkic.com Article")) at 4 ("The Serbian Prime Minister does not hide his strong ties to the underground. Asked if it is true that he has ties to criminals, Prime Minister Djindjic in his interview for Sunday Telegraph . . . confirms that is correct that he comes from that milieu.").

### b. Press Reports About the Plaintiff

During the time period discussed above, the press also wrote articles about the plaintiff.  <u>See</u> ECF No. 158-2, Material Facts I ¶ 77.  His political views, as well as his political activities, were reported by the press.  <u>See</u> Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article Entitled "I am [B]eing [A]ttacked in Serbia for [H]elping Djindjic" ("September 2003 Article")) at 1 ("Several sources in Belgrade confirmed for 'Nacional' that [the plaintiff] came under fire of . . . favorites of the past regime who cannot forgive him for helping the opposition in overthrowing Slobodan Milosevic . . . ."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (2001 Article Entitled "Bosnian Serb [P]arty [S]ays Serb [E]ntity [R]uled [B]y [P]rivate [B]usinessman" ("2001 Businessman Article")) at 1 ("The chairman of the executive committee of the Serbian Radical Party SRS in the Bosnian Serb Republic,[10] Mirko Blagojevic, said today that [the plaintiff] was 'at the helm of the Serb Republic' because 'he donated a large amount of money to Prime Minister Mladen Ivanic's election campaign, and in return asked that his aide, Milenko Vracar, be appointed finance minister[.']"); Def.'s Summ. J. Mot., ECF No. 151-3, Ex. 25 (1998 Article Interviewing Zepter Entitled "The Time of Wisdom Has Come" ("1998 Interview")) at 2 ("[T]he Serbian Republic have a sincere friend in [the plaintiff] . . . . The time has come when this country must finally be led by wisdom rather than by feelings.  It must act in a calculated manner, wisely, and with selected allies in every respect, i.e., political, national and economic. . . .  I am convinced that the Serbian Republic is facing an economic transformation. I feel that the way of thinking which has become deeply rooted in most of the government is changing.  To put it simply, you must

---

[10]  The Serbian Republic, also known as "Republika Srpska," refers to a "Serbian-majority enclave . . . in Bosnia."  ECF No. 158-2, Material Facts I ¶ 52.

get used to fostering the principles that have created civilization and its greatest achievement are democracy and the market economy. . . . In conclusion, politics is always responsible or should be for what happens to us."); Def.'s Summ. J. Mot., ECF No. 151-5, Ex. 27 (Article Entitled "How Milan Jankovic Became Philip Zepter" ("How Jankovic Became Zepter")) at 18 (recognizing that the plaintiff "became politically engaged" two years before article was published).

Through the press, the plaintiff publicly expressed his desire to "enter [the] political arena" in Serbia. Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64 (December 2001 Glas Javnosti Article) at 4 ("I want to help Serbia. . . . When in a few years, I enter political arena, I will enter to win."); see also Def.'s Summ. J. Mot., ECF No. 152-28, Ex. 65 (December Ekonomija 2001) at 1 ("According to his own words, [the plaintiff] is not a shadow ruler of Serbia[,] but a man who wishes to contribute to the victory of democracy, law, and action, over inaction and anarchy.").

The plaintiff used the press to voice his approval of Djindjic's political agenda for the future of Serbia. E.g., Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64 (December 2001 Glas Javnosti Article) at 2 ("I have helped, in many ways, . . . opposition activists and activities in Serbia. That is why I was not favored by the former regime (the fact for which I am, of course, proud) . . . .); id. at 3 ("The fact that at the time of Milosevic's reign of terror, Mr. Djindjic was the fiercest and most consistent defendant of the honor and dignity of the Serbian people in the Western media has been consistently hidden from our country's public eye . . . The people with good (political) taste should be impressed by this. . . . That is why, at the time of the darkest Milosevic's dictatorship, I publicly stated in an interview for the magazine 'Profil' that I am most impressed by Djindjic

among all the politicians on the Serbian political scene, and I can repeat that today as well . . . . I will support, to the horror of my 'critics[,'] not only the current Prime Minister, but also all those for whom I believe that they can bring prosperity to my country and my people."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Blic News Article Entitled "[Djindjic]'s Promotion in USA is Financed by Zepter" ("June 2001 Blic News Article")) at 44 (quoting the plaintiff as stating: "In the polluted political life in Serbia everyone is striving to become the new Milosevic and to rule as he did . . . . However, I do see a glimpse of bright light in the general hopelessness. Zoran [Djindjic] is certainly one of them.").

And as reported by the press, the plaintiff's approval translated into political and financial support for Djindjic. See, e.g., Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 (interview of the plaintiff wherein he acknowledged that he "made many enemies by helping Zoran [Djindjic] come to power, for being his close friend"); Def.'s Summ. J. Mot., ECF No. 152-30, Ex. 67 (January 2002 Article Entitled "Seller of Empty Pots" ("January 2002 Article")) at 2 (characterizing the plaintiff as someone who "declares himself a supporter of the Prime Minister's politics"); Def.'s Summ. J. Mot., ECF 151-12, Ex. 34 (June 2001 Article From www.spo.org Archives ("June 2001 SPO Article")) at 1 (referring to "[the plaintiff] . . . []as the financier of the Democratic Party"); Def.'s Summ. J. Mot., ECF No. 153-13, Ex. 81 (www.milovanbrkic.com Article) at 15 ("[The plaintiff], also invested more than ten million dollars in the Democratic Party and Mr. Djindjic personally."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Politika Article), at 31 ("[The plaintiff] has been

14

talked about for years as one of the main financiers of the former Serbian opposition, primarily of Zoran Djindjic and the Democratic Party.").

Specifically, the plaintiff's financial support of Djindjic included helping Djindjic retain the services of a United States lobbyist named James Denton to represent Serbian interests in this country. See, e.g., ECF No. 158-2, Material Facts I ¶ 81 ("[The plaintiff] agreed to pay for the services of James Denton."); see also Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 ("I was helping [Djindjic] . . . by mostly giving advice, but in other ways too, primarily by paying a company that was lobbying for the opposition in the USA at the time. That way I wanted to present a new Serbia in the USA, so Washington can recognize the new democratic alternative, to show that Serbia is not what Milosevic had created it to be . . . ."); Def.'s Summ. J. Mot., ECF No. 153-24, Ex. 92 (July 2003 Article Entitled "Zepter was Paying the Serbian Government's Lobbyists" ("July 2003 Article")) at 1 (reporting that the plaintiff was paying "$120,000 dollars a year, as well as traveling expenses," for James Denton to "perform[] public relations work for the Serbian [g]overnment in the United States aimed at establishing a friendly and constructive relationship between the two countries" (internal quotations omitted)); Def.'s Summ. J. Mot., ECF No. 153-16, Ex. 84 (February 2002 Article Entitled "Who [A]re the [R]ich [B]usinessmen [W]ho [F]inance Serbian [P]arties?" ("February 2002 Article") at 10 (reporting that the plaintiff "has been mentioned" as the individual who would "pa[y] for" the $120,000 service fee in the agreement "between the president of the Serbian government Zoran [Djindjic] and an independent American consultant James Denton"); Def.'s Summ. J. Mot., ECF No. 152-30, Ex. 67 (January 2002 Article) at 2-3 ("'News' was the first (and the only one at that

15

time) publication that published fax copies of documents which unambiguously confirmed that . . . [the plaintiff] was paying Jim Danton [sic] a lobbying fee on behalf of Zoran Djindjic.  In his statement for 'News,' Jim Danton [sic] personally confirmed that, as well.  There was nothing in dispute about that, except for the general question of whether Zoran Djindjic had some obligations toward [the plaintiff] because of that, and the fact that the deputies of the Serbian Assembly were not informed, as they should have been, about that arrangement."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (December 2001 Article Entitled "And This is Serbia" ("December 2001 Article")) at 84 ("They signed an agreement whereby the company 'Zepter' will pay two hundred thousand dollars per year for the promotion of the Prime Minister in the US.  A fax copy of this agreement was published in the weekly magazine 'Blic News,' but none of the other media had the courage to transmit this article."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A  (June 2001 Politika Article), at 31 ("For years he denied it and, even now after 'Blic News' revealed that [the plaintiff] will pay James Denton, an independent U.S. consultant, to lobby on behalf of Serbia in the United States, no one in Zepter International wanted to say a word about it."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Blic News Article), at 41 (reporting on contract between Djindjic and lobbyist James Denton, where Denton was to "be engaged in public relations in the USA on behalf of the Serbian [g]overnment" and present Serbia as "a stable, forward-looking country, suitable for investment"); id. ("Denton will work under the supervision of the Prime Minister [Djindjic] or his representative on renewing friendly relationships between the two countries, especially with the Administration of President Bush and the US Congress, identifying and coordinating American programs of technical and

economic assistance." (internal quotations omitted)).  Further, the plaintiff also acknowledged to the press that he was an "adviser for international economic business affairs" for Prime Minister Djindjic.  Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 (interview of the plaintiff wherein he recognized that "when [Djindjic] became Prime Minister, [the plaintiff became] his adviser for international economic business affairs").

And during Djindjic's tenure as prime minister, the press reported on the friendship between the plaintiff and Djindjic.  See ECF No. 158-2, Material Facts I ¶ 137; Def.'s Summ. J. Mot., ECF No. 152-28, Ex. 65 (December 2001 Ekonomija Article Entitled "I Have Never Traded in Arms" ("December Ekonomija 2001") at 1 ("As far as his connections with Serbia's Prime Minister Zoran Djindjic are concerned, [the plaintiff] states that the two have known each other for a long time and that they are friends."); Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64 (December 2001 Glas Javnosti Article Entitled "My Answer to Them" ("December 2001 Glas Javnosti Article")) at 2 (the plaintiff stating that "I have known mister Djindjic for many years, and I still proudly say that we are friends.  I believe in friendship."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (December 2001 Article) at 84 ("[The plaintiff] is a close friend of Zoran Djindic's.")

Not only did their friendship "attract public attention," but the press also began to question whether the plaintiff was receiving preferential treatment from Djindjic's government.  See Def.'s Summ. J. Mot., ECF No. 153-14, Ex. 82 (June 2002 Article Entitled "In Search of Money Origins" ("June 2002 Article") at 2 (inquiring about the allegation that "companies such as Zepter, . . . that are allegedly close to the regime, have been exempted from taxes, and it has attracted public attention"); see also Material Facts

I ¶ 172; Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001 Article 3 From www.spo.org Archives ("September 2001 SPO Article")) at 13 ("Instead of subjecting [the plaintiff's] wealth and monopoly on all state affairs to investigation, the Mafia don Zoran Djindjic is giving him support for the suppression of opposition activity and critical thought in Serbia. . . . [The] Serbian Renewal Movement will . . . illuminate[] the character and deeds of [the plaintiff], organizer and patron of smuggling and crime in Serbia."); Def.'s Summ. J. Mot., ECF 151-12, Ex. 34 (June 2001 SPO Article) at 1 (reporting that Djindjic "flew abroad free of charge by planes owned by [the plaintiff]"); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (December 2001 Article) at 84 ("In July of this year, Zoran Djindjic spent part of his vacation as [the plaintiff]'s guest in Monte Carlo."). The public had come to believe that the plaintiff was "the most important financier of the Serbian Government" and that he was "the most important and most influential businessman in Serbia." Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (August 2001 Article Entitled "The Zepter State" ("August 2001 Article")) at 51 ("[The plaintiff] has decided to conquer Serbia . . . in his own way. Namely, [the plaintiff] has become the most important financier of the Serbian Government: out of his own pocket, he is financing Jim Denton, an American lobbyist for Zoran Djindjic; he is paying the bills incurred by the Government abroad, [and] investing in the fallen Serbian economy. . . . Well-informed people even claim that [the plaintiff] has become the most important and most influential businessman in Serbia, and that his words count.").

### 4. The Alleged Defamatory Passage

"In July 2003, [the International Crisis Group] published Report 145, entitled 'Serbian Reform Stalls Again' . . . in which [the International Crisis Group] offered its

policy recommendations concerning the progress of political and economic reform in Serbia and the integration of Serbia into international institutions following the March 2003 assassination of Serbian Prime Minister Zoran Djindjic." ECF No. 157-1, Material Facts II ¶ 12. "The report was intended to address several subjects related to advancing peace and regional stability." ECF No. 158-2, Material Facts I ¶ 40. In particular, Report 145 addressed "the inability of the Serbian government to assert civilian control over Milosevic-era police, military and intelligence agencies," as well as continuing Serbian "concerns regarding the influence of wealthy businessmen on Serbia's fledgling democracy, businessmen commonly referred to as oligarchs or tycoons." Id. (internal quotations omitted)); see also ECF No. 157-1, Material Facts II ¶¶ 22, 24.

"James Lyon was the [International Crisis Group] employee who primarily researched and wrote [Report 145]." ECF No. 158-2, Material Facts I ¶ 18. Lyon "ha[d] studied and [wa]s familiar with the Balkans region," id. ¶ 20, "ha[ving] traveled, studied, and worked in the Balkans, including Serbia, for many years," id. ¶ 21. "He was the [International Crisis Group] project director for Serbia between 2000 through 2005, based in Belgrade." Id. "Lyon began working on [Report 145] in the [S]pring of 2003." Id. ¶ 40.

To gather information for Report 145, "Lyon conducted many interviews on the subject of the businessmen oligarchs."[11] Id. ¶ 64. He "communicated with officials in

_____

[11] The defendant's proffered undisputed facts nos. 64, 65, and 66, are not genuinely in dispute by the plaintiff. In response to these proffered facts, the plaintiff argues that the "evidence does not support" these facts "because Lyon has refused to identify his sources." ECF No. 158-2, Material Facts I ¶¶ 64-66. The plaintiff does not contest, however, that Lyon has testified that he did in fact rely on confidential sources. And reliance on confidential sources for publications is entirely permissible in the context of a defamation case. Cf. McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1508 (D.C. Cir. 1996) ("'[T]he plaintiff must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt.'" (quoting Secord v. Cockburn, 747 F. Supp. 779, 794 (D.D.C. 1990))); Clyburn v. News

(continued . . .)

the Serbian . . . government, as well as with officials associated with the embassies and intelligence services of the NATO powers which had intervened militarily in Serbia." Id. ¶ 65. These "sources of information with respect to Report No. 145 . . . requested that their identities be kept confidential . . . ." Def.'s Summ. J. Mot., ECF No. 148-2, Declaration of Dr. James Lyon ("Lyon Decl.")) ¶ 49. Based on the interviews he conducted, Lyon concluded that "it was impossible during the Milosevic era to have amassed significant wealth without the sponsorship of, or direct assistance from, the regime or its security services." ECF No. 158-2, Material Facts I ¶ 66. And the plaintiff was allegedly one of these individuals. Def.'s Summ. J. Mot., ECF No. 148-2, Lyon Decl. ¶¶ 42-48; see also Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001 SPO Article) at 13 ("Financier of the Democratic Party, [the plaintiff], according to the writing of many domestic and foreign media a famous arms dealer, who is called to account by the Israeli government, a businessman who acquired enormous wealth in Serbia from unknown sources during Slobodan Milosevic's rule . . . .").

In addition to interviews with confidential sources, Lyon "also knew that [the plaintiff] had been the subject of various media reports because [he] had closely monitored the Balkan media for many years in the context of [his] work for [the International Crisis Group]." Def.'s Summ. J. Mot., ECF No. 148-2, Lyon Decl. ¶ 51; see also id. ¶¶ 53, 54 (explaining that he was aware of "publications charg[ing] that [the plaintiff]'s business improperly benefitted in various ways from his relationships with leading politicians").

---

(. . . continued)
World Comme'ns,705 F. Supp. 635, 642 (D.D.C. 1989) ("defendants reliance on the confidential sources, who, in turn, relied on informants, does not indicate actual malice"), aff'd, 903 F.2d 29 (D.C. Cir. 1990).

Based on Lyon's knowledge and his research, the following excerpt from Report

145 ("challenged passage") was published:

> The unwillingness to continue the crackdown reflects the power of the Milosevic-era financial structures that-with the rigid oversight once provided by the dictator removed-have transformed themselves into a new Serbian oligarchy that finances many of the leading political parties and has tremendous influence over government decisions. Some of the companies were originally formed as fronts by State Security or Army Counterintelligence (KOS), while others operated at the direct pleasure of the ruling couple. Under Milosevic, many of these companies profited from special informal monopolies, as well as the use of privileged exchange rates. In return, many of them financed the regime and its parallel structures.
>
> Some of the individuals and companies are well known to average Serbs: Delta Holding (Milorad Miskovic), Karic (Bogoljub Karic), Pink (Zeljko Mitrovic), Zepter (Milan Jankovic, aka Filip Zepter), Kapital Banka (Djordje Nicovic), Toza Markovic (Dmitar Segrt), Progres (Mirko Marjanovic), Simpo (Dragan Tomic), Komercijalna Banka (Ljubomir Mihajlovic), Novokabel (Djordje Siradovic), Stanko Subotic, Dibek (Milan Beko), ABC (Radisav Rodic), Hemofarm (Miodrag Babic), AIK Banka Nis (Ljubisa Jovanovic) and Dijamant (Savo Knezevic) are but some of the most prominent. Because of the support they gave to Milosevic and the parallel structures that characterised his regime, many of these individuals or companies have at one time or another been on EU visa ban lists, while others have had their assets frozen in Europe or the US.[80]
>
> In the popular mind, they and their companies were associated with the Milosevic regime and benefited from it directly. The DOS campaign platform in September 2000 promised that crony companies and their owners would be forced to answer for past misdeeds. Few of the Milosevic crony companies have been subjected to legal action, however. The enforcement of the "extra-profit" law is often viewed as selective and there have been only a handful of instances in which back taxes, perhaps 65 million Euros worth, have been collected. Most disturbing is the public's perception that-at a time when the economy is worsening-these companies' positions of power, influence and access to public resources seem to have changed very little.

Jankovic v. Int'l Crisis Grp., 593 F.3d 22, 24 (D.C. Cir. 2010) (internal alterations and

footnote omitted). Footnote 80 cites to two websites, which were non-functional. See id.

at 26. Lyon believed that Report 145 was accurate when it was published. Material Facts I ¶ 101.[12]

The plaintiff was just "a small part" of Report 145. See ECF No. 158-2, Material Facts I ¶ 41. The defendant "never contacted [the plaintiff] for comment concerning the allegations or anything else in Report 145 before publishing Report 145." ECF No. 157-1, Material Facts II ¶ 20.

**B. Procedural History**

This Court granted the defendant's initial motion to dismiss all of the plaintiff's defamation, false light invasion of privacy, and tortious interference claims, concluding, inter alia, that the challenged passage was not capable of a defamatory meaning. Jankovic v. Int'l Crisis Grp., 429 F. Supp. 2d 165, 178 (D.D.C. 2006) aff'd in part, rev'd in part and remanded, 494 F.3d 1080 (D.C. Cir. 2007). On appeal, the District of Columbia Circuit partially reversed this Court's ruling, finding that the challenged passage in Report 145 was susceptible of a defamatory meaning and that the plaintiff's claims should not have been dismissed. Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1091, 1092 (D.C. Cir. 2007). Following the Circuit's remand, the defendant filed another motion to dismiss, arguing that the challenged passage was shielded by the fair report and fair comment privileges, as well as protected as an opinion, and that the tortious interference claim was inadequately pleaded. See Jankovic, 593 F.3d at 25. The District of Columbia Circuit affirmed this Court's dismissal of the tortious interference claim, but

---

[12] The plaintiff disputes this fact asserting that "Lyon (and ICG) should have known that the allegations against [the plaintiff] in Report 145 were false, or at least doubted their veracity." ECF No. 158-2, Material Facts I ¶ 101 (emphasis added). But this response does not controvert what Lyon believed when the defendant published Report 145.

reversed this Court's dismissal of the plaintiff's defamation and false light invasion of privacy claims, concluding that "none of the privileges or protections raised" by the defendant applied to the assertion that the plaintiff supported and received benefits from the Milosevic regime. Id. at 26. In support of the Circuit's conclusion, it found that footnote 80 in the challenged passage of Report 145, which purportedly led readers of the report to an Office of Foreign Assets Control ("OFAC") website containing a 1998 frozen assets list and a 1998 Executive Order, id., did "[n]ot . . . suggest[] that . . . [the plaintiff], supported the Milosevic regime or received advantages in exchange," id. at 27 (emphasis in original).[13] The Circuit, therefore, again remanded the case to this Court for further "proceedings consistent with [its] opinion." Id. at 30.

The defendant now seeks summary judgment on the grounds that it is not liable for either the defamation or the false light invasion of privacy claims because the plaintiff is a public figure as a matter of law, and the plaintiff cannot show by clear and convincing evidence that the defendant acted with actual malice when it published the challenged passage of Report 145.[14]

### III.    Legal Analysis

### A.  Public Figure Analysis

First Amendment protection is afforded to defendants when the object of an alleged defamatory statement is about a public figure. New York Times v. Sullivan, 376

---

[13] On appeal, the defendant represented that footnote 80 provided the "factual basis for the connection between [the plaintiff] and the Milosevic regime." Jankovic, 593 F.3d at 28.

[14] The only claims remaining in this case are the plaintiff's defamation and false light invasion of privacy claims against the defendant. As explained herein, because the plaintiff's defamation claim cannot survive summary judgment, the false light invasion of privacy claim also cannot survive. Parsi v. Daioleslam, 890 F. Supp. 2d 77, 92 (D.D.C. 2012); Shipkovitz v. The Wash. Post Co., 571 F. Supp. 2d 178, 183 (D.D.C. 2008), aff'd sub nom. 408 F. App'x 376 (D.C. Cir. 2010).

U.S. 254, 270 (1964). The issue of whether a plaintiff is a public figure is a question of law for the courts to determine. See Waldbaum, 627 F.2d at 1294 n.12. There are two types of public figures: (1) general public figures who maintain such status for all purposes and (2) limited-purpose public figures "'(who) voluntarily inject[] [themselves] or [are] drawn into a particular public controversy and therefore become[] . . . public figure[s] for a limited range of issues.'" Id. at 1292 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974)). "A person becomes a general purpose public figure only if he or she is 'a well-known celebrity,' his name a 'household word.'" Tavoulareas v. Piro, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc) (citation omitted). "Few people," however, "attain the general notoriety that would make them public figures for all purposes." Waldbaum, 627 F.2d at 1296. Much more common are "public figures for the more limited purpose of certain issues or situations." Tavoulareas, 817 F.2d at 772. The defendant agrees that the plaintiff is not a general public figure. E.g., Private Figure Opp'n at 1. But the parties dispute whether the plaintiff is a limited-purpose public figure for a limited range of issues.

The District of Columbia Circuit has formulated a three-prong test to determine whether an individual is a limited-purpose public figure. Lohrenz v. Donnelly, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (citing Waldbaum, 627 F.2d at 1294). First, the Court must determine whether a public controversy existed. See Waldbaum, 627 F.2d at 1296. This assessment requires the Court to determine whether there was "a dispute that in fact ha[d] received public attention because its ramifications w[ould] be felt by persons who [we]re not direct participants." Id. at 1296. Second, the Court must analyze the plaintiff's role in the controversy. Id. at 1297. "Trivial or tangential participation is not enough. . . . [To

be considered a limited[-]purpose public figure, a plaintiff] must have achieved a 'special prominence' in the debate." Id.  To satisfy the "special prominence" requirement, "[t]he plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." Id.  Finally, the Court must assess whether the "alleged defamation [was] germane to the plaintiff's participation in the controversy." Id. at 1298. As applied here, the defendant has established that the plaintiff is a limited-purpose public figure as determined by Waldbaum's three-prong test.[15]

### 1.  The Scope of the Public Controversy

The parties do not dispute the existence of a public controversy "concerning the progress of political and economic reform in Serbia and the integration of Serbia into international institutions." Pl.'s Private Figure Mot. at 5; Private Figure Opp'n at 4. Instead, they disagree as to the temporal scope of the public controversy. See Private Figure Reply at 5.  According to the plaintiff, the scope of the public controversy is addressed by Report 145—"the post-Djindjic Serbian government's lack of progress in implementing political and economic reform and what that meant for Serbia's integration into the international community." Pl.'s Private Figure Mot. at 17 (emphasis in original); see also Summ. J. Opp'n at 8-9.  But the defendant argues that the temporal scope of the public controversy is not so limited. See Private Figure Opp'n at 4-12; Def.'s Summ. J. Mot. at 16-24.  The defendant concedes that Report 145 is relevant to the Court's task of

---

[15]  In reaching its conclusion that the plaintiff is a limited-purpose public figure, the Court did not rely on the plaintiff's business activities or philanthropic work, which the plaintiff contends are irrelevant to the limited-purpose-public-figure inquiry. See Summ. J. Opp'n at 18-22.  Therefore, the Court need not address the propriety of those factors in conducting its analysis.

identifying the proper temporal scope of the public controversy inquiry, but also argues that the Court must "look[] beyond the content" of Report 145 and evaluate the context in which Report 145 was published. Private Figure Opp'n at 4-5. Thus, the defendant contends that the proper temporal scope of the controversy is Serbian political and economic reform, and integration into international institutions, in the post-Milosevic Serbian government. Id. at 12.

The Court agrees with the defendant. In Waldbaum, the District of Columbia Circuit explained:

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. . . . The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

Waldbaum, 627 F.2d at 1297 (internal citations and footnotes omitted)).[16]

Here, a reasonable reading of Report 145 reveals that while it did emphasize economic and political reforms after the assassination of Djindjic, or the lack thereof, such reform was part of the "larger debate" concerning economic and political reforms in Serbia after the ouster of Milosevic from power in 2000. See Hatfill v. The New York Times Co., 532 F.3d 312, 322-23 (4th Cir. 2008); see also Tavoulareas, 817 F.2d at 767,

---

[16] The plaintiff suggests that press clippings that "post-date the public of Report 145" should be entitled to no weight. Private Figure Reply at 24; see also Summ. J. Opp'n at 14, 22-23. The plaintiff cites no case on point for the wholesale rejection of press articles that post-date the publication at issue in a libel case even if those articles discuss events that occurred on or before the challenged publication was published. To the extent the articles are dated after Report 145's publication date of July 2003, the Court will only rely on the retrospective aspects of those articles. This is consistent with the Court's obligation in determining the plaintiff's private or public status when the allegedly defamatory statements were made.

773 (identifying public controversy concerning how the United States' private oil industry "should respond to the rise of OPEC and the ensuing energy crisis" in the 1970s); OAO Alfa Bank v. Ctr. for Pub. Integrity, 387 F. Supp. 2d 20, 43 (D.D.C. 2005) (isolating the public controversy as "[t]he rise of the oligarchs and the decline of the Russian economy into what one observer described as a 'criminal-syndicalist state' was one of the defining foreign policy controversies of the 1990s, and the topic of intense discussion in the media, classrooms, think tanks, and the government of the United States, as well as through the rest of the world").  As the defendant correctly observes, Report 145 is replete with references to the political and economic climate in Serbia prior to Djindjic's assassination.  See Private Figure Opp'n at 10-12.  Indeed, it would be extremely difficult to understand "the post-Djindjic Serbian government's lack of progress in implementing political and economic reform and what that meant for Serbia's integration into the international community" discussed in Report 145, Pl.'s Private Figure Mot. at 17 (second emphasis added), if Report 145 did not compare the degree of progress to the status quo before Djindjic's assassination.  Thus, the plaintiff's reading of Report 145 is too narrow.

Beyond Report 145, there was "regular[]" press attention given to the "specific question," Waldbaum, 627 F.2d at 1297, of whether Serbian political and economic reform could take place once Milosevic's reign ended, ECF No. 158-2, Material Facts I ¶ 164 ("The future of Serbian reforms was of international concern, and prominent news publications regularly covered the issue."); ECF No. 151-9, Ex. 31 (January 2001 Economist Article) at 2 ("One of Serbia's leading columnists, by no means a fan of Mr[.] Milosevic, calls Mr[.] Djindjic 'Little Slobo[,'] implying that he has the same dictatorial

tendencies."); id. at 3 ("If foreigners are to invest, the judiciary must be cleaned up, and

the criminals who ran the show under Mr[.] Milosevic must be dealt with. Many well-

wishers fear that Mr[.] Djindjic, who is far from monkish himself, may not be inclined to

take them on."). And one aspect of that public debate included Djindjic's ability to

institute meaningful reforms in the Serbian government, notwithstanding his questionable

associations with "the financial elite." Def.'s Summ. J. Mot., ECF No. 151-10, Ex. 32

(January 2001 Reporter Article) at 2 ("[T]here's a wave of attacks against Djindjic as

well: statements that the changes he's trying to introduce are purely cosmetic and aimed

at following the financial elite created during the Milosevic regime – representatives of

whom are allegedly his close friends – to keep its positions and power[.]"). "The public

plainly ha[d] a vital interest . . . in . . . the groups or factions supporting" Djindjic, as

well as the "the quality of [his] . . . backers" because they do "play an influential role in

ordering [Serbian] society." Thompson v. Evening Star Newspaper Co., 394 F.2d 774,

776 (D.C. Cir. 1968); see also Def.'s Summ. J. Mot., ECF No. 153-21, Ex. 89 (March

2003 Article) at 1 ("Mr. Djindjic himself had many complicated business interests . . .

and many Serbs saw him as an elegant kingpin turned politician."); Def.'s Summ. J. Mot.,

ECF No. 152-4, Ex. 41 (August 2001 Financial Times Article) at 1 ("Today, Djindjic is

Prime Minister – an international star. He has long been considered in the [W]est to be a

guarantor of democracy in the Balkans. But behind this facade lurks a different, scarcely

perceived side: Contradictions in which the Serbian government head has entangled

himself, as well as contacts with businesspeople that are classed as part of organized

crime, cast dark shadows over the purported shining light. . . . [T]his top politician has

become involved with people who undermine his credibility."). Accordingly, the Court

finds that there was a public controversy about Serbian economic and political reform, as well as its integration into international institutions, after Milosevic lost power, when Report 145 was published.

## 2. The Plaintiff's Role in the Public Controversy

The plaintiff's participation in the public debate concerning economic and political reform in Serbia, and its integration into international institutions after Milosevic's downfall, was neither trivial nor tangential. The plaintiff reportedly assisted in the "overthrow[] of Slobodan Milosevic," Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 1 ("Several sources in Belgrade confirmed for 'Nacional' that [the plaintiff] came under fire of . . . favorites of the past regime who cannot forgive him for helping the opposition in overthrowing Slobodan Milosevic . . . ."), which was the impetus for the public controversy the Court identified above, ECF No. 158-2, Material Facts I ¶ 164 ("The future of Serbian reforms was of international concern, and prominent news publications regularly covered the issue."). During the relevant timeframe, the plaintiff publicly expressed his desire to enter the Serbian "political arena"[17] Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64 (December 2001 Glas Javnosti Article) at 4 ("I want to help Serbia. . . . When in a few years, I enter political arena, I will enter to win."), so that he could "contribute to the victory of democracy," id. ("I do not govern Serbia, but I want to contribute to the victory of democracy, justice, and work over the lack of work and anarchy. It is true that, for a number of years, on a daily

---

[17] The plaintiff's access to the press further bolsters this Court's conclusion that the plaintiff is a limited purpose public figure. See Gertz, 418 U.S. at 344 ("[P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements th[a]n private individuals normally enjoy."). And indeed, the plaintiff had such access during the relevant time period. See, e.g., Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64.

basis I have lobbied for prosperity and wellbeing of my country and my people."); Def.'s Summ. J. Mot., ECF No. 152-28, Ex. 65 (December Ekonomija 2001) at 1 (same). And the plaintiff was a public and ardent supporter of Djindjic both politically and financially, see Def.'s Summ. J. Mot., ECF No. 152-27, Ex. 64 (December 2001 Glas Javnosti Article) at 3 (according to the article, the plaintiff stated: "The fact that at the time of Milosevic's reign of terror, Mr. Djindjic was the fiercest and most consistent defendant of the honor and dignity of the Serbian people in the Western media has been consistently hidden from our country's public eye . . . . The people with good (political) taste should be impressed by this. . . . That is why, at the time of the darkest Milosevic's dictatorship, I publicly stated in an interview for the magazine 'Profil' that I am most impressed by Djindjic among all the politicians on the Serbian political scene, and I can repeat that today as well . . . . I will support, to the horror of my 'critics[,'] not only the current Prime Minister, but also all those for whom I believe that they can bring prosperity to my country and my people."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Politika Article) at 31 ("[The plaintiff] has been talked about for years as one of the main financiers of the former Serbian opposition, primarily of Zoran Djindjic and the Democratic Party."), so much so that he "made many enemies," Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 (interview of the plaintiff wherein he acknowledged that he "made many enemies by helping Zoran [Djindjic] come to power, [and] for being his close friend").

At a minimum, the plaintiff attempted to influence or shape Serbia's political and economic direction while Djindjic was the Prime Minister of Serbia. Waldbaum, 627 F.2d at 1298 n.2 ("If in fact [the plaintiff] is shaping or trying to shape the outcome of a

specific public controversy, he is a public figure for that controversy . . . .").  He, along with Djindjic, sought to improve diplomatic relations between the United States and Serbia by financing Serbian lobbying efforts in the United States.[18]  ECF No. 158-2, Material Facts I ¶ 81 (the plaintiff "agreed to pay for the services of James Denton"); Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 (article reporting that the plaintiff stated: "I was helping Djindjic by giving advice, but in other ways too, primarily by paying a company that was lobbying for the opposition in the USA at the time.  That way I wanted to present a new Serbia in the USA, so Washington can recognize the new democratic alternative, to show that Serbia is not what Milosevic had created it to be . . . ."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Blic News Article), at 41 (reporting on contract between Djindjic and lobbyist James Denton, where Denton was to "be engaged in public relations in the USA on behalf of the Serbian [g]overnment" and present Serbia as "a stable, forward-looking country, suitable for investment"); id. ("Denton will work under the supervision of the Prime Minister [Djindjic] or his representative on renewing friendly relationships between the two countries, especially with the Administration of President Bush and the US Congress,

---

[18]  The plaintiff understandably attempts to downplay his payment to Denton for Serbian lobbying efforts in the United States.  See Summ. J. Opp'n at 13 ("[The plaintiff] simply agreed to pay for Denton's efforts."). This oversimplifies the nature of the transaction.  First, the sum of money was not insignificant, as it was reportedly over $100,000.  See, e.g., Def.'s Summ. J. Mot., ECF No. 153-24, Ex. 92 (July 2003 Article) at 1 (reporting that the plaintiff was paying "$120,000 dollars a year, as well as traveling expenses," for James Denton to "perform[] public relations work for the Serbian government in the United States aimed at establishing a friendly and constructive relationship between the two countries" (internal quotations omitted)).  Second, the lobbying efforts that the plaintiff paid for were intended to affect Serbia politically and economically.  See, e.g., Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (June 2001 Blic News Article), at 41 (reporting that Denton was to "be engaged in public relations in the USA on behalf of the Serbian [g]overnment" and to present Serbia as "a stable, forward-looking country, suitable for investment"); id. ("Denton will work under the supervision of the Prime Minister [Djindjic] or his representative on renewing friendly relationships between the two countries, especially with the Administration of President Bush and the US Congress, identifying and coordinating American programs of technical and economic assistance." (emphasis added) (internal quotations omitted)).

identifying and coordinating American programs of technical and economic assistance" (internal quotations omitted)).  Additionally, the plaintiff served as an "adviser" to Djindjic on "international economic business affairs."  Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 (interview of the plaintiff wherein he acknowledged that "when [Djindjic] became Prime Minister, [he became] his adviser for international economic business affairs").  In light of this conduct, the plaintiff "realistically [could have been] expected to have a major impact," <u>Waldbaum</u>, 627 F.2d at 1292, on political and economic reforms in Serbia, as well as the integration of Serbia into international institutions, after Milosevic's removal from power.

Regardless of whether the plaintiff intended to keep his friendship with Djindjic "private," Pl.'s Private Figure Mot. at 20, the record demonstrates that the plaintiff entered into a friendship with Djindjic that carried the "risk" of political scrutiny, <u>see</u> <u>Clyburn</u>, 903 F.2d at 33 ("One may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy."); <u>Waldbaum</u>, 627 F.2d at 1292 ("Th[e] limited-purpose public figure is an individual (who) voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." (internal quotations omitted)); <u>id.</u> at 1298 ("Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome."), and the press got wind of it and swept him into the public discussion regarding political and

economic reform in the post-Milosevic regime in Serbia,[19] Def.'s Summ. J. Mot., ECF No. 153-14, Ex. 82 (June 2002 Article) at 2 (inquiring about the allegation that "companies such as Zepter, . . . that are allegedly close to the regime, have been exempted from taxes and it has attracted public attention"), including Djindjic's tie to the "financial elite," see Def.'s Summ. J. Mot., ECF No. 151-10, Ex. 32 (January 2001 Reporter Article) at 2 ("[T]here's a wave of attacks against Djindjic as well: statements that the changes he's trying to introduce are purely cosmetic and aimed at following the financial elite created during the Milosevic regime – representatives of whom are allegedly his close friends – to keep its positions and power[.]"); see also Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001 SPO Article) at 13 ("Instead of subjecting [the plaintiff's] wealth and monopoly on all state affairs to investigation, the Mafia don Zoran Djindjic is giving him support for the suppression of opposition activity and critical thought in Serbia. . . . [The] Serbian Renewal Movement will . . . illuminate[] the character and deeds of [the plaintiff], organizer and patron of smuggling and crime in Serbia.").[20]

---

[19] For example, the press reported on potential political or economic wrongdoing by the plaintiff. Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001 SPO Article) at 13 ("Financier of the Democratic Party, [the plaintiff], according to the writing of many domestic and foreign media a famous arms dealer, who is called to account by the Israeli government, a businessman who acquired enormous wealth in Serbia from unknown sources during Slobodan Milosevic's rule . . . ."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (January 2002 Article Blic Entitled "The [M]urder a [C]riminal, the [P]erson [O]rdering the [M]urder [U]nknown" ("January 2002 Blic Article")) at 100 ("[T]he investigative committees could not confirm the previous allegation from the initial report that the main organizer and financier of the murder of the Minister of Defense was [the plaintiff], but we came across two more pieces of cross-referenced information concerning him."); Def.'s Summ. J. Mot., ECF No. 152-28, Ex. 65 (December Ekonomija 2001) at 1 (reporting that the plaintiff wrote "a letter to the public" denying allegations regarding an assassination plot and arms trading); see also OAO Alfa Bank, 387 F. Supp. 2d at 44 (using the fact that the plaintiffs had "been the repeated target[s] of allegations of collusion and illegality" to support its finding that the plaintiffs played a non-trivial and non-tangential role in the public controversy).

[20] The defendant's reliance on Bennett v. Hendrix, 426 F. App'x 864 (11th Cir. 2011) is unavailing, as it does not stand for the proposition the plaintiff advances. Summ. J. Opp'n at 13. There, the Court found that the plaintiff was not a limited purpose public figure only because the alleged "defamation was not

(continued . . .)

The plaintiff's public political and financial support of Djindjic "markedly raised the chances that he would become embroiled in [the] public controversy." Clyburn, 903 F.2d at 33, see also Thompson, 394 F.2d at 776 (finding plaintiff was a public figure who "did not confine himself to private discussion of the issues in [a] primary [political campaign]" and who "took a prominent role in a group appealing for public support" to be a public figure). His support led the press to even anoint him the "most important financier of the Serbian Government." Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (August 2001 Article) at 51 ("[The plaintiff] has decided to conquer Serbia . . . in his own way. Namely, [the plaintiff] has become the most important financier of the Serbian Government: out of his own pocket, he is financing Jim Denton, an American lobbyist for Zoran Djindjic; he is paying the bills incurred by the Government abroad, investing in the fallen Serbian economy . . . . Well-informed people even claim that [the plaintiff] has become the most important and most influential businessman in Serbia, and that his

---

(. . . continued)

germane to the sole public activity in which [the plaintiff] participated," and therefore, the third prong of the Waldbaum analysis was lacking. See id. at 866. The Bennett court was silent as to the other prongs of the Waldbaum analysis. See id. And in any event, the plaintiff in Bennett "played no role other than contributing money to a campaign." Id. Here, the plaintiff's activities far exceed those of the plaintiff in Bennett.

Further, neither Wells v. Liddy, 186 F.3d 505, 534-35 (4th Cir. 1999), nor Gertz, 418 U.S. at 351-52, is helpful to the plaintiff. Summ. J. Opp'n at 14-16. In both cases, the plaintiffs played a less active role in their respective public controversies, see Wells, 186 F.3d at 534-35; Gertz, 418 U.S. at 352, than the plaintiff here played in the public controversy concerning Serbian political and economic reform during Djindjic's term as prime minister in Serbia, as he, among other things, voluntarily financed lobbying efforts in the United States on behalf of the Serbian government, e.g., Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 ("I was helping [Djindjic] . . . by mostly giving advice, but in other ways too, primarily by paying a company that was lobbying for the opposition in the USA at the time. That way I wanted to present a new Serbia in the USA, so Washington can recognize the new democratic alternative, to show that Serbia is not what Milosevic had created it to be . . . ."), and was an international business affairs adviser for Djindjic, id. (recognizing he "made many enemies by helping Zoran Djindjic come to power, [and] for being his close friend," and then "when [Djindjic] became Prime Minister, [the plaintiff became] his adviser for international economic business affairs").

words count."). The plaintiff, therefore, had a "sufficiently central role in the controversy." Clyburn, 903 F.2d at 31.

Accordingly, the Court rejects the plaintiff's proposition that he played no role in any public controversy.[21] See Summ. J. Opp'n at 8-10. The fact that the plaintiff did not appear frequently in the defendant's reporting of the Balkans is not dispositive.[22] See id. at 10-11. Rather, the Court also "can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements." Waldbaum, 627 F.2d at 1297; see also id. at 1292 (" [Th[e] limited-purpose public figure is an individual

---

[21] The plaintiff attempts to invoke the prohibition against elevating a plaintiff from a private figure to a public figure as a result of the plaintiff's response to the defamation at issue in a particular case. See Summ. J. Opp'n at 14-15. Although that is an accurate understanding of the law, it has no application here. To the extent that the plaintiff is responding to defamatory attacks in the Serbian press articles identified by the defendant, the plaintiff is not responding to the alleged defamatory content in Report 145. Therefore, no impermissible bootstrapping has occurred in the Court's analysis.

The plaintiff also cites a series of Supreme Court cases in an attempt to transform himself from a limited-purpose public figure to a private figure in regards to this case. See Summ. J. Opp'n at 23-24. These cases are inapposite as they hinge in large part on the fact that the plaintiffs in those cases played a trivial role in whatever public controversy existed—if a public controversy even existed at all. See Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 167 (1979) (finding that the plaintiff "played only a minor role in whatever public controversy there may have been"); Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979) (finding that there was no particular public controversy identified and that the plaintiff "did not thrust himself or his views into public controversy to influence others"); Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) (finding that the "[d]issolution of a marriage through judicial proceedings is not" a public controversy, and that the plaintiff did not "freely choose to publicize issues as to the propriety of her married life").

[22] Nor is it persuasive that many of the defendant's employees are not familiar with either the plaintiff or his role in political and financial reforms after Milosevic's removal from power in Serbia. See Gray v. St. Martin's Press, Inc., No. 95-285-M, 1999 WL 813909, at *2 (D.N.H. May 19, 1999), aff'd, 221 F.3d 243 (1st Cir. 2000) (finding the plaintiff a limited-purpose public figure, despite the fact that "several editors and other employees" at the defendant publisher "had never heard of" the plaintiff).

The plaintiff's reliance on three declarations from individuals who were familiar with Serbian politics in the relevant timeframe, but were unaware of the plaintiff's role in Serbian political and economic reforms at the time, does not convince the Court that its conclusion about his public-figure status is incorrect. See Summ. J. Opp'n at 11, 13, 23 n.8; see also Summ. J. Opp'n, ECF No. 158-4 (Declaration of James Denton) ¶ 10; Summ. J. Opp'n, ECF No. 158-3 (Declaration of William Montgomery); ¶¶ 10, 16; Summ. J. Opp'n, ECF No. 158-7 (Declaration of Aleksandra Joksimovic) ¶¶ 14, 16. They do not dispute that the Serbian press published the articles the defendant has cited, which demonstrate that the plaintiff was a part of the public controversy.

(who) voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." (internal quotations omitted)). And in so doing, the Court is persuaded that the plaintiff was an outspoken political and financial supporter of Djindjic, who "could realistically have been expected . . . to have an impact" on Serbian political and financial reform, as well as Serbia's integration into international institutions, during the relevant timeframe.[23] See, e.g., Def.'s Summ. J. Mot., ECF No. 154-10, Ex. 113 (September 2003 Article) at 4 ("I was helping [Djindjic] . . . by mostly giving advice, but in other ways too, primarily by paying a company that was lobbying for the opposition in the USA at the time. That way I wanted to present a new Serbia in the USA, so Washington can recognize the new democratic alternative, to show that Serbia is not what Milosevic had created it to be . . . ."); id. ("[W]hen [Djindjic] became Prime Minister, [the plaintiff became] his adviser for international economic business affairs."); Def.'s Summ. J. Mot., ECF No. 153-13, Ex. 81 (www.milovanbrkic.com Article ) at 15 ("[The plaintiff], also invested more than ten million dollars in the Democratic Party and Mr. Djindjic personally."); Def.'s Summ. J. Mot., ECF No. 153-14, Ex. 82 (June 2002 Article) at 2 (inquiring about the allegation

---

[23] The plaintiff does not appear to be a stranger to political controversy. See Def.'s Summ. J. Mot., ECF No. 152-28, Ex. 65 (December Ekonomija 2001) at 1 (reporting that the plaintiff wrote "a letter to the public" denying allegations regarding an assassination plot and arms trading); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (January 2002 Blic Article) at 100 ("[T]he investigative committees could not confirm the previous allegation from the initial report that the main organizer and financier of the murder of the Minister of Defense was [the plaintiff], but we came across two more pieces of cross-referenced information concerning him. Some senior military and police officials were not able to hide their fear at the mention of [the plaintiff]'s name, while the former Minister of Interor of Serbia said that in the past charges had been filed against 'Zepter Bank' for large illegal acquisitions of foreign currency on the streets, which resulted in inflation . . . ."); Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (February 2003 Article Entitled "Law Against the Tobacco Mafia" ("February 2003 Article")) at 113 ("[The plaintiff] was mentioned in passing [during Parliament], and according to the claim of the Radical Party leader, he has earned around 25 billion dollars here in about ten years in sales of cookware, but also weapons, with no taxes paid.").

that "companies such as Zepter, . . . that are allegedly close to the regime, have been exempted from taxes and it has attracted public attention").

### 3. The Relevance of the Challenged Passage in Report 145 to the Plaintiff's Role in the Public Controversy

The plaintiff contends that there is no nexus between the alleged defamatory association between him and the Milosevic regime in the challenged passage of Report 145 and the public controversy regarding political and economic reform, and Serbia's integration into international institutions, after Milosevic's removal from the government. See Summ. J. Opp'n at 17-18. The plaintiff argues with that the challenged passage in Report 145 does not concern his relationship with Djindjic, which he contends is the extent of his involvement with Serbian political and economic reform in post-Milosevic Serbia. See Summ. J. Opp'n at 17-18. But the plaintiff's position fails to acknowledge that the regime replacing Milosevic, which included Djindjic, ran its political campaign on the "promise[]" that those with ties to the Milosevic regime "would be forced to answer for past misdeeds." Pl.'s Private Figure Mot., ECF No. 145-4, Ex. 12 (Report 145) at 17. And while Djindjic may have been perceived as the "<u>anti-Milosevic</u>," Private Figure Reply at 12 (emphasis in original), there was also a simultaneous public debate as to whether that was the indeed the case. See Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001 SPO Article) at 13 ("Financier of the Democratic Party, [the plaintiff], according to the writing of many domestic and foreign media a famous arms dealer, who is called to account by the Israeli government, a businessman who acquired enormous wealth in Serbia from unknown sources during Slobodan Milosevic's rule . . . ."); Def.'s Summ. J. Mot., ECF No. 151-10, Ex. 32 (January 2001 Reporter Article) at 2 ("[T]here's a wave of attacks against Djindjic as well: statements that the changes he's

trying to introduce are purely cosmetic and aimed at following the financial elite created

during the Milosevic regime – representatives of whom are allegedly his close friends –

to keep its positions and power[.]"); ECF No. 151-9, Ex. 31 (January 2001 Economist

Article) at 2 ("One of Serbia's leading columnists, by no means a fan of Mr[.] Milosevic,

calls Mr[.] Djindjic 'Little Slobo[,'] implying that he has the same dictatorial

tendencies.").

"[A]nswering for past misdeeds," Pl.'s Private Figure Mot., ECF No. 145-4, Ex.

12 (Report 145) at 17, committed under Milosevic's rule is, therefore, not "wholly

unrelated" to the debate concerning Serbian political and economic reforms after he was

ousted from power in Serbia, see OAO Alfa Bank, 387 F. Supp. 2d at 44 (finding alleged

defamatory statements concerning corruption and illegal conduct of Russian oligarchs, a

"component of" and not "'wholly unrelated'" to "the debate over the consequences of

Russia's economic reforms" (quoting Tavoulareas, 817 F.2d at 774)).   Accordingly, the

Court finds that the challenged passage in Report 145 is germane to the plaintiff's

participation in the public controversy.

### B. Malice

Reflecting this country's "national commitment to the principle that debate on

public issues should be uninhibited, robust, and wide-open," the First Amendment sets a

high bar for "public figures" to prevail on a defamation claim.  New York Times, 376

U.S. at 270.  Specifically, a public figure may prevail in a defamation suit only if the

public figure can produce "clear and convincing evidence" that the challenged

publication was made with "actual malice"—i.e., with "knowledge that it was false or

with reckless disregard of whether it was false or not."  Masson v. New Yorker

Magazine, Inc., 501 U.S. 496, 510 (1991).  As the Supreme Court has explained, "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact."  Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984).  "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice."  Id. (internal quotations omitted).

"The standard of actual malice is a daunting one."  McFarlane v. Esquire Magazine, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  To meet this burden, the plaintiff can "come forward with any direct evidence of actual malice."  OAO Alfa Bank, 387 F. Supp. 2d at 49.  Otherwise, "[p]roof of actual malice may take the form of circumstantial evidence."  Id. at 50 (citing Clyburn, 903 F.2d at 33).  Moreover, the plaintiff is "entitled" to "the benefit of the aggregate of [the] evidence" concerning actual malice.  Lohrenz, 350 F.3d at 1283 (citing MacFarlane, 74 F.3d at 1304, and Tavoulareas, 817 F.2d at 794 n.43).  However, "courts have identified only three scenarios in which the circumstantial evidence of subjective intent could be so powerful that it could provide clear and convincing proof of actual malice."  Id.  "These scenarios are where there is evidence that the story: (i) was 'fabricated' or the product of defendants' imagination; (ii) is 'so inherently improbable that only a reckless man would have put [it] in circulation'; or (iii) is 'based wholly on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous telephone call.'"  Id. (quoting McFarlane, 91 F.3d at 1512-13).  "[A]ctual malice[, however,] does not automatically become a question for the jury

whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith." Tavoulareas, 817 F.2d at 789. "Such an approach would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence." Id.

Here, because the plaintiff is a limited-purpose public figure, the burden of demonstrating actual malice proves too much for the plaintiff to overcome on summary judgment, as he merely introduces "pieces of circumstantial evidence tending to show that the defendant published in bad faith," which are individually and collectively insufficient as a matter of law to demonstrate actual malice on the part of the defendant.[24] Id. This burden is compounded by the plaintiff's seemingly erroneous understanding of the evidentiary standard for malice at the summary judgment stage for a limited public figure such as himself. See Summ. J. Opp'n at 26-27. The plaintiff asserts that it is unnecessary for him to come forward with clear and convincing evidence for a reasonable jury to conclude that the defendant acted with actual malice in publishing the challenged passage. See id. Not so.

In a Supreme Court case cited by the plaintiff himself, the summary judgment standard is clearly explained:

---

[24] The failure to prove malice renders the plaintiff's motion for partial summary judgment on the element of material falsity moot. Clyburn v. News World Comm'ens, Inc., 705 F. Supp. 635, 643 (D.D.C. 1989) aff'd, 903 F.2d 29 (D.C. Cir. 1990) ("The Court concludes that [the] plaintiff is a limited[-]purpose public figure, and that he has failed to present sufficient evidence to allow a reasonable jury to find actual malice by clear and convincing evidence. Therefore, summary judgment for [the] defendant[] is warranted on the libel claim and the intentional infliction of emotional distress claim. [The] [p]laintiff's motion for partial summary judgment on the issue of falsity is denied as moot.").

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under [New York Times Co. v. Sullivan, 376 U.S. 254 (1964)]. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Anderson, 477 U.S. at 254 (emphasis added). Consequently, "[a]s a limited-purpose public figure, [the plaintiff] c[an] successfully resist a summary judgment motion only if [he] c[an] point to record evidence from which a reasonable jury could find (by the 'clear and convincing' standard) that the [defendant] published the articles in question with actual malice." Clyburn, 903 F.2d at 33 (quoting Anderson, 477 U.S. at 254)); see also Lohrenz, 350 F.3d at 1283.

Not once does the plaintiff contend that he has come forth with "clear and convincing" evidence of actual malice in this libel suit that creates a genuine issue of material fact for trial. The plaintiff merely argues that there is "sufficient" evidence to raise a genuine issue as to whether the defendant acted maliciously in publishing the alleged defamatory remarks about the plaintiff in Report 145. See, e.g., Summ. J. Opp'n at 26, 45. But based on the plaintiff's opposition to the defendant's motion for summary judgment, the plaintiff's understanding of what is "sufficient" to survive summary judgment on the issue of malice, is not "clear and convincing" evidence—it is some lesser standard. As a result of the plaintiff's failure to contend that there is "clear and convincing" evidence demonstrating malice on the part of the defendant in publishing the challenged passage in Report 145,[25] the Court grants summary judgment to the defendant.

---

[25] Because the defendant argued that the plaintiff has not put forth "clear and convincing" evidence of actual malice, and the plaintiff has not responded otherwise, the Court could treat that argument as conceded. See Lewis v. District of Columbia, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2,

(continued . . .)

Alternatively, even construing the plaintiff's opposition as having argued that "clear and convincing" evidence of malice exists in the evidentiary record, the Court would still grant the defendant's motion for summary judgment because the plaintiff's purported circumstantial evidence of the defendant's malicious intent in publishing the challenged passage in Report 145 are legally insufficient to clearly and convincingly demonstrate malice.[26]  See Tucker v. Fischbein, 237 F.3d 275, 286 (3d Cir. 2001) (explaining that theories of actual malice "grounded on allegations of poor journalistic practices" such as "a preconceived story-line," "not follow[ing] . . . editorial guidelines," and "fail[ing] to conduct a thorough investigation . . . are without support in the case law").

First, the plaintiff accuses the defendant of disregarding its own operating procedures in publishing Report 145.  See Summ. J. Opp'n at 33-35 (enumerating several internal publication standards that International Crisis Group did not follow).  But as the Supreme Court and this Circuit has explained, the evidence of malice "must show more than 'highly unreasonable conduct constituting an extreme departure from the standards

---

(. . . continued)
2011) (per curiam) ("'It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'" (quoting Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F.Supp.2d 15, 25 (D.D.C. 2003), aff'd, 98 Fed. App'x 8 (D.C. Cir. 2004))).

[26]  The Court notes that the plaintiff must resort to circumstantial evidence of actual malice in the absence of direct evidence of actual malice because Lyon, who primarily researched and wrote Report 145, has testified that he believes the challenged passage in Report 145 was accurate, see OAO Alfa Bank, 387 F. Supp. 2d at 49; ECF No. 158-2, Material Facts ¶ 101, and the plaintiff has offered nothing to the contrary. And to the extent any other employees of the defendant was involved with the production of Report 145, the plaintiff does not assert that any such employee subjectively doubted the accuracy of the challenged passage in Report 145, only that "they should have known" of its inaccuracy.  ECF No. 158-2, Material Facts I ¶ 101 ("Lyon (and ICG) should have known that the allegations against [the plaintiff] in Report 145 were false, or at least doubted their veracity." (emphasis added)); see also id. ¶¶ 102-03 (failing to show that any other employees of the defendant subjectively believed Report 145 was inaccurate).

of investigation and reporting ordinarily adhered to by responsible publishers.'"

Lohrenz, 350 F.3d at 1284 (quoting Harte-Hanks Commc'ns, Inc. v. Connaughton, 491

U.S. 657, 666 (1989)); see also Parsi v. Daioleslam, 890 F. Supp. 2d 77, 83 (D.D.C.

2012) ("[S]loppiness is not evidence of actual malice.").[27]

The plaintiff's reliance on Masson v. New Yorker Magazine, Inc., 960 F.2d 896

(9th Cir. 1992) is misplaced. There, "during a fact-checking process initiated" by the

defendant, the plaintiff spoke to the defendant's fact checker, raised objections about the

defamatory article, and suggested changes to the article. Id. at 900. The plaintiff's

allegations there also suggested that the fact checker looked into the merits of the

objections, the fact checker then removed some inaccuracies in the draft article, and that

the changes were not incorporated into the final publication. See id. at 901. As a result

of this conduct, the Ninth Circuit concluded that a jury could infer that the defendant had

serious doubt about the accuracy of what was written about the plaintiff. See id. at 902.

But no analogous series of events occurred here. Nor could it, as the plaintiff concedes

that the defendant "consciously chose to not contact [the plaintiff] to discuss its

allegations" before Report 145 was published. Summ. J. Opp'n. at 32.

Second, the plaintiff suggests that Report 145 was the product of a pre-conceived

story line that all wealthy Serbian citizens were Milosevic cronies.[28] See Summ. J.

_____

[27] The plaintiff argues that the defendant "showed reckless disregard for [the plaintiff] and his reputation."
Summ. J. Opp'n at 36. This appears to be another permutation of the plaintiff's argument concerning the
defendants failure to investigate the challenged passage of Report 145 thoroughly. Id. ("[International
Crisis Group] left attacks on [the plaintiff]'s name in Report 145 and did nothing to ensure that its claims
were accurate or properly supported."). As the Court just explained, this is a legally deficient basis for the
Court to deny summary judgment with respect to the issue of actual malice on the part of the defendant.

[28] As the defendant correctly notes, it is inconsistent to insist that on the one hand the defendant was out to
"get" him, while on the other hand highlighting the fact that the plaintiff was a "small part" of Report 145.
Summ. J. Reply at 27.

Opp'n at 31-32. Again, allegedly having a pre-conceived story line is not sufficient to demonstrate actual malice.[29] Tucker, 237 F.3d at 286 (explaining that theories of actual malice "grounded on allegations of poor journalistic practices" such as "a preconceived story-line . . . are without support in the case law"). And the defendant's decision to not contact the plaintiff confirming this story line, Summ. J. Opp'n at 32, is also not supportive of a finding of actual malice, see McFarlane, 91 F.3d at 1510-11 (reasoning that contacting the subject of allegedly defamatory allegations could reasonably result in denial of those allegations, but "'hardly alert the conscientious reporter to the likelihood of error'" (quoting Edwards v. Nat'l Audubon Soc'y, Inc., 556 F.2d 113, 121 (2d Cir. 1977)); see also Secord, 747 F. Supp. at 789 ("Accordingly, the plaintiff cannot rely on the defendant's failure to consult with him prior to the publication of [the allegedly defamatory material] as evidence of actual malice.").[30]

Third, the plaintiff avers that the defendant must have known that the plaintiff never supported Milosevic because he was close friends with Djindjic, who the defendant knew "vigorously opposed Milosevic and sought to overthrow the Milosevic regime." Summ. J. Opp'n at 32-33. But the defendant correctly notes that this "advances a false dichotomy." Summ. J. Reply at 24. Nothing in the record suggests that the defendant had obvious doubts that the plaintiff could not have had friendly relations with both

---

[29] Some of the assertions related to the defendant's alleged pre-conceived story line are without any record support. See Summ. J. Opp'n at 32 (lacking citations to the record).

[30] To the extent any contact was made between the plaintiff and Lyon, on behalf of the defendant, before Report 145 was published, see Summ. J. Reply, ECF No. 163-12, Ex. 8 (Deposition of Philip Zepter ("Zepter Dep. I")) at 301:9-20 (testifying that he potentially met with Lyon "shortly before" Report 145 was published), the meeting was "very short," id. at 307:21-308:1, and the plaintiff never suggested any corrections or provided any sources that called into doubt the reliability of Lyon's confidential sources that he relied upon for the challenged passage in Report 145, see id. at 311:20-22. The plaintiff's alleged representations during the purported meeting that the passages are inaccurate do not, as a matter of law, raise serious doubt about the veracity of the article. See McFarlane, 91 F.3d at 1510-11.

Milosevic and Djindic.[31]  Def.'s Summ. J. Mot., ECF No. 148-3, Ex. A (September 2001

SPO Article) at 13 ("Financier of the Democratic Party, [the plaintiff], according to the

writing of many domestic and foreign media a famous arms dealer, who is called to

account by the Israeli government, a businessman who acquired enormous wealth in

Serbia from unknown sources during Slobodan Milosevic's rule . . . ." (emphasis added));

id. ("Instead of subjecting his wealth and monopoly on all state affairs to investigation,

the Mafia don Zoran Djindjic is giving him support for the suppression of opposition

activity and critical thought in Serbia. . . . [The] Serbian Renewal Movement will . . .

illuminate[] the character and deeds of [the plaintiff], organizer and patron of smuggling

and crime in Serbia.").  In fact, the record even contains deposition testimony from a

former Serbian security chief, who was loyal to both Milosevic and Djindjic.  See Summ.

J. Reply, ECF No. 163-10, Ex. 6 (Deposition of Vojin Petrovic ("Petrovic Dep.")) at

9:20-12:15, 17:6-18:20 (explaining that he worked for Serbian state security during the

Milosevic and Djindjic regimes).

　　　　Fourth, the plaintiff asserts that the defendant's mistaken reliance on a United

States frozen assets list from OFAC demonstrates actual malice.  Summ. J. Opp'n at 36-

38.  The law does not support the plaintiff's assertion, as it amounts to nothing more than

a failure to investigate, which alone does not prove actual malice.  Lohrenz, 350 F.3d at

[31]  For example, it is reasonable that the plaintiff could have supported Milosevic for his benefit, but then
aligned himself with Djindjic after Milosevic's downfall.  Cf. Summ. J. Reply, ECF No. 163-16, Ex. 12
(Inst. For War & Peace Reporting, Serbia: Karic Affair Rocks Belgrade ("War & Peace Report")) at 1
("The Karics generously supported Milosevic's political projects, at the same time sponsoring several
opposition parties.  After his downfall, they turned their backs on him, hoping to preserve their fortune by
cosying [sic] up to the new government."); Def.'s Summ. J. Mot., ECF No. 153-21, Ex. 89 (March 2003
Article) at 1 ("Mr. Djindjic, no saint, made deals with various Serbian devils, both war criminals and
ordinary criminals, in organizing the overthrow of Slobodan Milosevic in October 2000.  The Serbian
popular revolt against Mr. Milosevic that year probably would not have succeeded without Mr. Djindjic
and his shadowy relationship with an officer of Mr. Milosevic's paramilitary police, Milorad Lukovic,
known as Legija.  And it was Legija, the next [S]pring, who carried out Mr. Djindjic's orders to arrest Mr.
Milosevic.").

1284 ("failure to investigate does not in itself establish bad faith" (citing St. Amant, 390

U.S. at 733)); Parsi, 890 F. Supp. 2d at 83 ("[S]loppiness is not evidence of actual

malice."). A failure to investigate only arises to the level of malice where the defendant

also has "obvious reasons to doubt the accuracy of a story." Lohrenz, 350 F.3d at 1284.

Here, however, the defendant understood and interpreted the OFAC list in a manner

consistent with OFAC. Summ. J. Reply at 26 (comparing International Crisis Group's

interpretation of the OFAC list with then-Director of OFAC's interpretation of the OFAC

list). And in any event, the defendant's employees testified that they did not doubt the

accuracy of the challenged passage in Report 145. ECF No. 158-2, Material Facts I ¶¶

101-03.

  Fifth, the plaintiff criticizes the defendant for relying on the Serbian press, which

the defendant described in Report 145 as "sensationalist bordering on libel" and

"notorious for spreading [rumors] and outright lies." Summ. J. Opp'n at 39 (quoting Pl.'s

Private Figure Mot., ECF No. 145-4, Ex. 12 (Report 145) at 9, 10). But, as explained

earlier, the plaintiff has taken these characterizations out of context. A reasonable

reading of Report 145 neither leads to the conclusion nor even implies that all Serbian

press articles cannot be trusted. See Pl.'s Private Figure Mot., ECF No. 145-4, Ex. 12

(Report 145) at 9-10. Similarly, the sources in the record cited by the plaintiff do not

demonstrate that the defendant should have ignored the information published by the

Serbian press entirely. See Summ. J. Opp'n at 39-40. In fact, Lyon, who was one of the

Balkan experts at the International Crisis Group and the primary researcher and author of

Report 145, recognized that the accuracy of the press had to be assessed on a "case-by-

case basis," as some press articles relied on "detailed information from certain

government media files." Def.'s Summ. J. Mot., ECF No. 150-1, Ex. 16 (Lyon Dep.) at 22:6-22. To the extent that the Serbian press lacked some degree of credibility, reliance on "some" of its articles is insufficient for a finding of actual malice. See McFarlane, 91 F.3d at 1508 ("'[T]he plaintiff must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt.'" quoting Secord, 747 F. Supp. at 794); Lohrenz, 350 F.3d at 1286 ("'reliance upon some biased sources . . . do[es] not amount to reckless disregard of the truth'" (quoting Loeb v. New Times Commc'ns Corp., 497 F. Supp. 85, 93 (S.D.N.Y. 1980))). In fact, the defendant's recognition that some unreliability exists, rebuts the plaintiff's contention that the defendant acted with actual malice. See McFarlane, 74 F.3d at 1304 ("full (or pretty full) publication of the grounds for doubting a source tends to rebut a claim of malice, not to establish one" (citing Tavoulareas, 817 F.2d at 788 n.35)).

Sixth, the plaintiff objects to the defendant's reliance on confidential sources to dispel any notion that it did not act maliciously in publishing the allegedly defamatory publication.[32] Summ. J. Opp'n at 44-45. But reliance on confidential sources to rebut any insinuation of malice is proper. Clyburn, 705 F. Supp. at 642 ("[D]efendants['] reliance on the confidential sources, who, in turn, relied on informants, does not indicate actual malice."). And contrary to the plaintiff's position, Summ. J. Opp'n at 44-45, the defendant did not have an obligation to verify the reliability or existence of the confidential sources unless "the defendant actually possessed subjective doubt," as to

---

[32] The plaintiff complains that the defendant should not be permitted to rely on confidential sources to defend against his claim of malice, while simultaneously preventing the disclosure of their identities. Summ. J. Opp'n at 44. But if the plaintiff believed that Lyon was obstructing his discovery efforts by shielding the identities of Lyon's confidential sources, he could have filed a motion to compel while discovery was being conducted. That was not done.

their veracity.  McFarlane, 91 F.3d at 1508 (quoting Secord, 747 F. Supp. at 794 ).  The plaintiff has not presented clear and convincing evidence as to why Lyon should have doubted, let alone that he did doubt, the reliability of his confidential sources.  The plaintiff, without proof, merely calls them "shadowy," Summ. J. Opp'n at 44, which is insufficient to show that Lyon should have doubted the information he received from his confidential sources, see McFarlane, 91 F.3d  at 1508 (allowing the defendant to rely on a questionable source so long as there is no subjective doubt on the part of the defendant).

Finally, the plaintiff's charge that Lyon "targeted Zepter . . . for extortion" is an appealing basis for finding actual malice at first blush.[33]  Summ. J. Opp'n at 29-31.  According to the plaintiff, Lyon met with the plaintiff "in an airport in Geneva[, Switzerland] and solicited money in exchange for ceasing . . . further publication of negative allegations about [the plaintiff]."  Id.  Even accepting this allegation as true, it does not amount to "clear and convincing" evidence of malice.[34]  As the District of Columbia Circuit has explained:

---

[33]  As additional circumstantial evidence of actual malice, the plaintiff calls into question Lyon's credibility, Summ. J. Opp'n at 31, and alludes to an electronic exchange of correspondence between Lyon and a "Serbian government employee," wherein Lyon alleged that the plaintiff "operated a front company that smuggled weapons to Al-Qaeda and was engaged in money laundering" and was told that the allegation was not true, id.  The plaintiff's reliance on this collateral electronic correspondence is misplaced.  The substance of the electronic correspondence does not concern the challenged passage of Report 145, so it is not evidence that Lyon subjectively doubted the accuracy of the challenged passage in Report 145.  And there is no indication from the record that Lyon was informed by anyone, aside from the plaintiff, that the association drawn between Milosevic and the plaintiff in Report 145 was unfounded.

[34]  The plaintiff attempts to corroborate this alleged extortion scheme through declarations of third parties.  E.g., Opp'n to Def.'s Strike Mot. at 6.  But for reasons explained later, these declarations constitute inadmissible evidence that the Court cannot consider in its summary judgment analysis.

It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice. The rationale for this rule is that speech honestly believed, whatever the speaker's motivation, contributes to the free interchange of ideas and the ascertainment of truth. To recover, plaintiffs cannot ground their claim on a showing of intent to inflict harm, but must, instead, show an intent to inflict harm through falsehood. . . . The appropriateness of such evidence must be determined on a case-by-case basis, bearing in mind that evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith.

Tavoulareas, 817 F.2d at 795 (internal citations, quotations, and alterations omitted).

Thus, even if Lyon attempted to solicit money from the plaintiff in return for Lyon's termination of his derogatory allegations about the plaintiff, this does not show a "willingness to publish falsehoods" about the plaintiff.[35] Id. To the contrary, during this alleged meeting, the plaintiff admits that Lyon told him that he "ha[d] reliable sources" and that he "believed" that what he wrote about the plaintiff was "true." Summ. J. Reply, ECF No. 163-12, Ex. 8 (Deposition of Philip Zepter ("Zepter Dep. I")) at 307:21-311:7. In fact, the plaintiff admits that allegations concerning the others identified along with him in the challenged passage of Report 145 as allegedly having supported Milosevic, are "mostly" true. Def.'s Summ. J. Mot., ECF No. 150-7, Ex. 22 (Deposition of Philip Zepter II ("Zepter Dep. II") at 292:3-5 ("I[ am] in the same category like all these people

_____

[35] The plaintiff seems to contradict himself concerning his contact with Lyon before Report 145 was published. According to the plaintiff, the defendant, i.e., Lyon, "never contacted [the plaintiff] for comment concerning the allegations or anything else in Report 145 before publishing Report 145." ECF No. 157-1, Material Facts II ¶ 20 (emphasis added); see also Summ. J. Opp'n at 32. Yet the plaintiff testified during his deposition that he met with Lyon either "shortly before" or "shortly after[]" Report 145 was published. Summ. J. Opp'n, ECF No. 163-12, Ex. 8 (Zepter Dep. I) at 301:9-20. In light of this seeming contradiction, it can be reconciled only if what the plaintiff sought to convey is that his meeting with Lyon must have occurred after the defendant published Report 145. And even if Lyon had reason to subjectively doubt the accuracy of what he wrote after Report 145 was published, that is insufficient to demonstrate actual malice. See Parsi, 890 F. Supp. 2d at 88 ("[A] plaintiff must show [that the] defendant 'realized the inaccuracy at the time of publication.'" (emphasis in original) (quoting Bose Corp., 466 U.S. at 512)).

that really have connections with the Milosevic regime."); id. at 292:6-11 ("Q: . . . Do

you agree that the other people in the category who were listed did have [connections

with Milosevic?] – A: Mostly. Yes."). So, there is no basis for the Court to find that

Lyon had reason to subjectively entertain serious doubts as to the truth of what was

published about the plaintiff in Report 145, as he was legally permitted to rely on

confidential sources. See McFarlane, 91 F.3d at 1508. Although the Court certainly does

not condone such journalistic behavior, if in fact it occurred,[36] the law of this Circuit does

not permit the plaintiff to prove malice through "contemptible" behavior. See

Tavoulareas, 817 F.2d at 796 ("[The defendant]'s avowed interest in [unlawfully]

obtaining documentary evidence from [the plaintiff] . . ., no matter how contemptible the

means to be employed, does not indicate a willingness to publish unsupported

allegations." (emphasis in original)). The case law "resoundingly rejects the proposition

that a motive to disparage someone is evidence of actual malice." Parsi, 890 F. Supp. 2d

at 90.

Finally, the Court's examination of the plaintiff's proffered evidence of actual

malice in the aggregate does not compel a different outcome, see Lohrenz, 350 F.3d at

1283, 1284 (recognizing that plaintiff was entitled to "the benefit of the aggregate of her

evidence" regarding actual malice, but finding no malice despite evidence that the

defendant was "on a mission to advance a preconceived story line," that the defendant

"acted on the basis of a biased source," and that the defendant had "incomplete

---

[36] The plaintiff filed a motion to strike expense receipts from Lyon that the defendant attached in its reply memorandum in support of the defendant's motion for summary judgment. Pl.'s Strike Mot. at 1. The expense receipts purportedly rebut Lyon's attempt to extort the plaintiff in Geneva, Switzerland. See id. at 2. But because the Court finds no actual malice on the part of the defendant in publishing the challenged passage of Report 145, notwithstanding any meeting between the plaintiff and Lyon, the plaintiff's motion is moot.

information"); <u>McFarlane</u>, 91 F.3d at 1510, 1511-14 (finding "cumulative force of the evidence" of actual malice to be "very weak" where evidence demonstrated a "failure to contact any individual who would have had first-hand knowledge," a "lack of corroboration," a reliance on a source with "credibility" issues, as well as a document that yielded an "inconsistency"), as even collectively, it does not demonstrate clearly and convincingly that the challenged passage in Report 145 was fabricated, inherently improbable, or based on a source that the defendant or any of its employees had obvious reasons to doubt, <u>Lohrenz</u>, 350 F.3d at 1284. In sum, none of the plaintiff's proffered evidence is enough to bring this case before a jury that must find by clear and convincing evidence that the defendant maliciously published the challenged passage in Report 145.[37]

### 4. The Defendant's Motion to Strike Hearsay Declarations

The defendant sought to preclude the Court from considering, in its summary judgment analysis, the declarations of three individuals submitted by the plaintiff, by moving to strike them on hearsay grounds. <u>See</u> Def.'s Mot. to Strike at 1-3. Those declarations were provided by the following individuals: (1) Dris Sayad, Pl.'s Private Figure Mot., ECF No. 145-6, Declaration of Dris Sayad ("Sayad Decl."); (2) Vibor

---

[37] The plaintiff's argument that the defendant should be barred from relying on a report from the Office of the High Representative ("OHR Report") for any purpose in resolving the parties' dispute is well founded. Summ. J. Opp'n at 40-41. The defendant unequivocally represented to the Court on several occasions that the OHR Report was not relevant to this litigation. <u>See id.</u> (citing all instances where the defendant instructed the Court to ignore the OHR Report). The plaintiff has undoubtedly relied on that representation and to allow the defendant to change course now would certainly prejudice the plaintiff. <u>See New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001) ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" (alteration in original) (quoting <u>Davis v. Wakelee</u>, 156 U.S. 680, 689 (1895)). In light of the defendant's earlier representations, the Court must judicially estop it from relying on the OHR report.

Mulic, Summ. J. Opp'n, ECF No. 158-8, Declaration of Vibor Mulic ("Mulic Decl.");

and (3) Elmar Jordan, Summ. J. Opp'n, ECF No. 158-9, Declaration of Elmar Jordan

("Jordan Decl."). Def.'s Mot. to Strike at 1-2. The declaration of Dris Sayad generally

describes the substance of a meeting he had with a man named Stanko Subotic, during

which Subotic allegedly explained how he was the target of an extortion scheme by

Lyon. See Pl.'s Private Figure Mot., ECF No. 145-6, Sayad Decl. ¶¶ 2-4, 6-7. Likewise,

Vibor Mulic's declaration describes meetings he had with, among others, a man named

Bogoljub Karic. See Summ. J. Opp'n, ECF No. 158-8, Mulic Decl. ¶ 4. During these

meetings, Karic allegedly also described an extortion attempt by Lyon. Id. ¶¶ 5-7. Elmar

Jordan's declaration calls into question the alleged Office of the High Representative

report ("OHR Report") relied upon by the defendant in publishing Report 145. See

Summ. J. Opp'n, ECF No. 158-9, Jordan Decl. ¶¶ 1-4. The Court will grant the

defendant's motion to strike the declarations of Dris Sayad and Vibor Mulic, but deny the

motion to strike the declaration of Elmar Jordan as moot because the defendant was

judicially estopped from relying on the OHR report.

The declarations of Sayad and Mulic essentially serve as mouthpieces for Subotic

and Karic, respectively. The defendant attempted to depose Subotic and Karic abroad in

this case, but to no avail. See Pl.'s Private Figure Mot., ECF No. 145-6, Sayad Decl. ¶ 2

("Mr. Subotic also agreed to give his deposition in this case at a later date. I have been

advised that he did not appear when scheduled in a Geneva Court."); Summ. J. Opp'n,

ECF No. 158-8, Mulic Decl. ¶ 3 ("I understand that Mr. Karic was going to testify in this

action but that he was unable to do so."); see also Def.'s Mot. to Strike at 5, 9 (describing

efforts to depose Subotic and Karic). The Court will not allow the plaintiff to subvert the

discovery process by using these declarations to oppose the defendant's motion for summary judgment, as the defendant has not had the opportunity to cross-examine the testimony of either Subotic or Karic.[38] Cf. United States ex rel. Fago v. M & T Mortgage Corp., No. 03-cv-1406(GK), 2006 WL 949899, at *1 (D.D.C. Apr. 11, 2006) (striking untimely declarations from individuals whose identities were not disclosed during discovery and whose depositions could not be taken); see also Judicial Watch, Inc. v. U.S. Dep't of Commerce, 224 F.R.D. 261, 263-64 (D.D.C. 2004) ("The 'requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented.'" (quoting Londrigan v. FBI, 670 F.2d 1164, 1174 (D.C. Cir. 1981))).

Further, consideration of these declarations would unfairly prejudice the defendant. Although the submission of declarations is appropriate in conjunction with summary judgment briefing, Fed. R. Civ. P. 56(c)(4),[39] the Court may strike declarations if they are irrelevant or unfairly prejudicial, see Wasserman v. Rodacker, No. 06-cv-1005(RWR), 2007 WL 274748, at *2 (D.D.C. Jan. 29, 2007); see also Judicial Watch, 224 F.R.D. at 264 ("[S]tatements that are impermissible hearsay, conclusory or self-serving are generally precluded.").

Here, the plaintiff's intent to demonstrate "that Lyon had engaged in similar extortionary conduct targeting others, including . . . Subotic and . . . Karic," Opp'n to

---

[38] The plaintiff argues that "at every step [the defendant] vigorously opposed any discovery from [Subotic and Karic]." Opp'n to Def.'s Strike Mot. at 6. But the plaintiff does not appear to dispute the defendant's contention that these witnesses' depositions were ultimately scheduled to occur until both declined to appear for their depositions. Def.'s Mot. to Strike at 5, 9; see also Def.'s Strike Mot. Reply at 6. The Court fails to see why, if the plaintiff is "[e]ndeavoring [t]o [h]ave . . . Subotic and . . . Karic [t]estify at [t]rial," Opp'n to Def.'s Strike Mot. at 6, he did not secure their depositions.

[39] Neither Sayad nor Mulic have "personal knowledge" of the alleged extortion attempts on Subotic and Karic, respectively. For this reason alone, the Court must also grant the defendant's motion to strike these two declarations. Fed. R. Civ. P. 56(c)(4).

Def.'s Strike Mot. at 6, is prohibited under the Federal Rules of Evidence, see Fed. R. Civ. P. 56(c)(4) ("declaration . . . must . . . set out facts that would be admissible in evidence" (emphasis added)). If considered, the evidence would clearly suggest that because Lyon allegedly attempted to extort others, then he must have engaged in the same type of behavior against the plaintiff as well. This is precisely the type of evidence that Federal Rule of Evidence 403, see Fed. R. Evid. 403 (excluding evidence where probative value is substantially outweighed by "unfair prejudice," "confus[ion of] the issues," or tendency to "mislead the jury"), and Federal Rule of Evidence 404 preclude, see Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); see also Judicial Watch, 224 F.R.D. at 264 (striking portions of a declaration that were "impermissible attempts to place before the Court irrelevant, impugning and/or inflammatory statements").[40] Accordingly, the Court did not consider these declarations in conducting its summary judgment analysis.[41]

## IV. Conclusion

For the foregoing reasons, the Court concludes that the plaintiff is a limited-purpose public figure, who has failed to present clear and convincing evidence for a

---

[40] For these reasons, the Court will ignore the declaration of Meho Omerovic as well. Opp'n to Def.'s Strike Mot., ECF No. 166-2.

[41] Nor would this evidence alone change the Court's outcome even if admissible. See Tavoulareas, 817 F.2d at 795 ("It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice.").

reasonable jury to find actual malice on the part of the defendant. Therefore, summary judgment is granted in favor of the defendant on the plaintiff's defamation claim, as well as his false light invasion of privacy claim, and the plaintiff's motions for partial summary judgment are denied.[42]

   **SO ORDERED** on this 4th day of November, 2014.

                                        REGGIE B. WALTON
                                        United States District Judge

---

[42] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.